## COMMONWEALTH *vs.* ALEXANDER PRING-WILSON.

Middlesex. January 2, 2007. - April 10, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* New trial. *Self-Defense. Evidence,* Self-defense, Prior violent conduct, Reputation, Unavailable witness. *Witness,* Unavailability.

This court concluded that the Commonwealth's appeal from the allowance of the criminal defendant's motion for a new trial under Mass. R. Crim. P. 25 (b) (2) was properly before it, where the substance of the motion was more in the nature of one filed under Mass. R. Crim. P. 30 (b). [731-732]

Following the conviction of the criminal defendant of voluntary manslaughter on an indictment charging him with murder in the first degree, the judge before whom the case had been tried did not abuse her discretion in granting the defendant a new trial based on his inability to introduce evidence of the violent pasts of the victim and his cohort, where the defendant claimed he acted in self-defense, the identity of the first aggressor was hotly contested, and the evidence allowed the jury to form a reasonable doubt about each of the prerequisites for self-defense; where the judge had prevented the defendant from introducing such evidence, based on the law as it stood at the time of trial; and where, after the defendant's conviction and sentence, but before his appeal, this court had released its opinion in *Commonwealth* v. *Adjutant,* 443 Mass. 649 (2005), announcing a new common-law rule granting trial judges the discretion in self-defense cases to admit prior bad act evidence of victims, even if unknown to the defendant, for purposes of illuminating the identity of the first aggressor. [732-737]

Discussion of matters likely to arise on the retrial of an indictment charging the defendant with murder in the first degree, including introduction of evidence of prior violent conduct on the part of the victim's cohort and questions to be asked in a colloquy should a witness invoke his rights under the Fifth Amendment to the United States Constitution. [737-738]

INDICTMENT found and returned in the Superior Court Department on May 6, 2003.

The case was tried before *Regina L. Quinlan,* J., and a motion for postconviction relief was heard by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Marguerite T. Grant,* Assistant District Attorney (*Adrienne C.*

*Lynch*, Assistant District Attorney, with her) for the Commonwealth.

*Charles W. Rankin (Jonathan Harwell* with him) for the defendant.

MARSHALL, C.J. In the early morning of April 12, 2003, the defendant, Alexander Pring-Wilson, became entangled in a fight with Michael Colono and Samuel Rodriguez outside a pizza restaurant in Cambridge. During the brawl, the defendant stabbed Colono, who later died. The defendant was indicted and tried on a charge of murder in the first degree.

The central issue at trial was whether the defendant acted in self-defense. To support his theory that Colono or Rodriguez started the fight, the defendant sought to introduce evidence of each man's prior violent behavior. At the time of trial, the law of self-defense in Massachusetts permitted a defendant knowledgeable about the victim's violent character to introduce evidence of the victim's specific violent acts or reputation for violence to demonstrate the defendant's reasonable apprehension for his or her safety. See, e.g., *Commonwealth* v. *Fontes*, 396 Mass. 733, 735-736 (1986); *Commonwealth* v. *Edmonds*, 365 Mass. 496, 501-502 (1974). But the law did not permit a defendant unaware of the victim's violent propensity to introduce evidence of that propensity to show who was the first aggressor. See, e.g., *Commonwealth* v. *Graham*, 431 Mass. 282, 291 (2000), and cases cited. Here, the defendant knew nothing of the violent histories of Colono or Rodriguez, who were strangers to him, and the trial judge disallowed the defendant's repeated attempts to introduce evidence of Colono or Rodriguez's violent pasts to demonstrate that either had a violent character.

The jury convicted the defendant of voluntary manslaughter.[1] The defendant filed a timely notice of appeal.

While the record was being assembled for appeal, we decided *Commonwealth* v. *Adjutant*, 443 Mass. 649 (2005) (*Adjutant*). There we held that "where the identity of the first aggressor is in dispute and the victim has a history of violence," the judge

---

[1]The judge instructed the jury on all three theories of voluntary manslaughter as a lesser included offense of murder: reasonable provocation, sudden combat, and the use of excessive force in self-defense.

has the discretion to admit "evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense." *Id.* at 664. Declaring that the decision marked a "new common-law rule of evidence," we stated that the rule "shall apply only prospectively." *Id.* at 667. But contrary to our regular practice when establishing a new rule not constitutionally mandated, see, e.g., *Commonwealth* v. *Dwyer, ante* 122, 124, 147 (2006); *Commonwealth* v. *King*, 445 Mass. 217, 248 (2005); *Commonwealth* v. *Dagley*, 442 Mass. 713, 720-722 & n.10 (2004), cert. denied, 544 U.S. 930 (2005), we afforded the defendant in *Adjutant* the benefit of the new rule, for reasons we explain below.

Within days of our deciding *Adjutant*, the judge here (who coincidentally had also been the trial judge in *Adjutant*) scheduled a hearing "to determine whether the conviction of the defendant should be vacated and a new trial ordered on the grounds that, although the court views the evidence as legally sufficient to support the verdict returned by the jury, the integrity of the evidence has been rendered suspect as a result of the decision of the Supreme Judicial Court in [*Adjutant*]." She also solicited legal memoranda from the parties. The defendant moved for a new trial, citing Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), which the Commonwealth opposed.

After a hearing, the judge issued a thoughtful memorandum of decision and order, allowing the defendant's motion, vacating his conviction, and ordering a new trial. She concluded, in the exercise of her broad discretion under rule 25 (b) (2), that the integrity of the defendant's trial was compromised by his inability to introduce evidence of the violent pasts of Colono and Rodriguez. She further concluded that, like the defendant in *Adjutant*, this defendant was entitled to a new trial because the propensity evidence he had sought to introduce was probative of the main issue in the case: the identity of the first aggressor. Having moved unsuccessfully for reconsideration, the Commonwealth appealed. We granted the Commonwealth's application for direct appellate review. We now affirm the judge's order granting the defendant a new trial.

1. *Background.* A consideration of the facts in evidence, as well as the facts excluded by the judge, is necessary for resolu-

tion of the central issue in this appeal. We therefore describe them in some detail, beginning with the evidence before the jury.

a. *The evidence at trial.* i. *Events preceding the fight.* During the evening of April 11, 2003, Rodriguez was visiting his mother's apartment in Lynn with his girl friend, Giselle Abreu. The two planned to join Colono (Rodriguez's cousin) and go to a bar in Somerville. Before leaving Lynn for the evening, Rodriguez and Abreu had an argument. At trial, each claimed the argument was only oral, but a percipient witness, Shawn Bates, testified that he saw Rodriguez beat Abreu. Bates telephoned the police, and the responding officers briefly questioned Rodriguez and Abreu. The incident unnerved Rodriguez and delayed the couple's outing — midnight came and went before they left to pick up Colono.

They drove Rodriguez's mother's automobile, a Chevrolet four-door sedan, taking with them a six-pack of beer and one half-pint bottle of brandy that Rodriguez had purchased for Colono; Rodriguez was twenty-one years of age at the time, and Colono was eighteen years of age. Earlier in the evening, Rodriguez had consumed some beer and whiskey. On their way to Colono's apartment in Cambridge, Rodriguez drove, but after collecting Colono, Rodriguez switched seats with Abreu. Rodriguez did not have a driver's license, and although Abreu also had no license, Rodriguez thought that it would be less likely that the police would stop the automobile if a woman was driving. Rodriguez sat in the front passenger seat with Abreu while Colono sat in the back seat.

The three decided to go to the Pizza Ring restaurant on Western Avenue. Abreu stopped in front of the restaurant. Rodriguez went inside and placed an order, then returned to the automobile, and the three waited until the pizza was ready. As they waited, Colono drank a couple of beers.

While the preceding events were unfolding, the following events were simultaneously transpiring. At about 9:30 P.M. on April 11, the defendant met a friend, Jennifer Hansen, and her friend at a diner in Davis Square. While there, the defendant drank a couple of whiskeys with soda. After about forty-five minutes, the three went to a nearby pub. There, the defendant

drank two sodas to which he added whiskey from a half-pint flask he had purchased on the way to the pub. At approximately 11:40 P.M., the three made their way to the Western Front, a bar and club near Central Square. The three drank the rest of the defendant's whiskey and danced, staying until the club closed at 1:30 A.M.

Hansen and her friend took a cab home, while the defendant began walking to his home, along Western Avenue. His route took him toward the Pizza Ring where Colono, Rodriguez, and Abreu were waiting in the automobile for their pizza. As he approached the Pizza Ring, the defendant was talking on his cellular telephone to his girl friend, Janice Olmstead. Shortly thereafter, the fight occurred between the defendant on the one hand, and Colono and Rodriguez on the other.

ii. *The fight.* From the perspective of Rodriguez and Abreu, the fight happened as follows. As the defendant approached their automobile, he was talking on his cellular telephone and appeared to be intoxicated and stumbling. Colono said, "Look at this dude walking down the street," and everyone in the automobile began laughing. Colono's window was open, and as the defendant passed, Colono either said that the defendant was "shitfaced" (Abreu's version) or told the defendant, "Get off the street" or "Get off the street, shitface" (Rodriguez's versions). Shortly after the defendant passed the automobile, he ended his telephone conversation, turned around, and came back to Colono's window. Rodriguez said to his cohorts that the defendant had "a lot of nerve" coming back to the automobile. The defendant leaned down, looked in the window, and asked Colono either, "Were you talking to me?" (Rodriguez's version), or "Excuse me. Did you say something?" (Abreu's version).[2] Colono answered, "Yes. Do you want to do something about it?," to which the defendant responded, "Yes," and opened Colono's door.[3] Colono got out of the automobile "as fast as he could" and started "swinging." Abreu said she saw "[p]unches everywhere," but did not see who threw the first punch.

---

[2]Even according to Rodriguez, the defendant did not behave angrily or insult Colono.

[3]A fingerprint test of the door handle was inconclusive.

According to Rodriguez, as the defendant and Colono wrestled, the defendant pushed Colono against a nearby brick wall and put Colono in a headlock — the defendant, standing over Colono, held Colono's head against the defendant's chest while Colono tried unsuccessfully to punch his way free. Abreu testified that the defendant appeared to be hitting Colono in the stomach and upper body and was "getting the best of" Colono. Rodriguez got out of the automobile to help Colono but was slightly delayed because the door was broken: he had to open his window and then open his door using the outside handle. When Rodriguez went to Colono's aid, he punched the defendant in the head and pulled the defendant to the ground. The defendant, Colono, and Rodriguez were of approximately the same height and weight. When Rodriguez pulled the defendant off Colono, the defendant fell on his backside (Abreu's version) or fell on his knees (Rodriguez's version), and Colono, who was wearing construction boots, tried to kick the defendant in the head but missed. Colono and Rodriguez then backed away and the defendant stood up. Colono told Rodriguez to be careful because the defendant had a knife, and then Colono got back in the automobile. At that point, both Rodriguez and Abreu saw for the first time that the defendant was holding a knife.[4] Although neither Rodriguez nor Abreu knew it yet, Colono had been slashed twice (in the abdomen and arm) and stabbed three times (twice in the chest and once in the abdomen).

Rodriguez put up his fists and asked whether the defendant was "ready for a piece of" him, to which the defendant replied, "Yes." Rodriguez then opened his hands to show he was carrying no weapon, said the fight was over, and got back into the front passenger seat of the automobile. Thinking the defendant would telephone the police, and wanting to avoid having to explain to the authorities what had happened (and concerned about the presence of alcohol in the automobile and that Abreu was driving without a driver's license), Abreu and her companions drove away.

The defendant's version of the fight differed markedly from

---

[4]The knife was a folding type with a four-inch blade that could be opened with one hand; it was a model designed for camping and other utility purposes, and the defendant carried and used it often for such purposes.

that of Abreu and Rodriguez. According to him, as he passed the automobile while talking on the telephone with Olmstead, he heard the people in the automobile "hailing" him or "calling out something." He told Olmstead he would call her back, put his telephone in his pocket, and walked back to the automobile to see what the occupants needed, believing they might need directions. He walked to the driver's window and saw three people in the automobile, two men in the front seats and a man or woman in the back seat; he was "one hundred percent sure" that he went to the driver's window, and he said that the driver was a man. With his hands at his sides, empty, he asked the driver, "Excuse me. Were you talking to me?" The driver answered, "Yeah. I'm talking to you, bitch." The defendant, a "little put off," said, "Well, fuck you then," and turned to walk away; he never touched the automobile. The man in the driver's seat then "came right out" of the automobile, hit the defendant in the nose, and slammed the defendant in the head with his fists. Although the defendant tried to stop him, a second man joined the fight "like that fast," hitting the defendant from behind; the next thing he knew, the defendant was on the ground trying to cover his head. The defendant thought he could not escape the beating:

> "[T]he worst was the guy in the back. He just kept on pounding me, like pow, like lights go out, come back in. It's like not just stars. It's like everything goes out and then everything comes back in. And it was just like over, and over, and over. And it was like that fast. . . .
>
> "I was thinking: What is going to stop these guys? Like they already had me down. . . . [T]here's nothing to stop these guys. Who is going to stop them? There's nobody on the street. There's nothing going on. . . . [A]re they going to know to stop before I'm dead? Are they going to stop when I'm unconscious? . . . .
>
> "[T]he only thing I can think of is like: Okay, okay, okay. Get your knife out, get your knife out. Get them away from you. . . . I'm scrambling. There's still hits like this [indicating] from above . . . like a pile driver . . . it just keeps going . . . . I pulled my knife out of my pocket,

and then I opened it up, and the next image I have is . . . looking at it . . . . And I'm like: All right. It's going to get them away. It's going to get them away."

The defendant then stabbed and slashed upward with the knife, trying to get the man in front of him away so that he could escape. Although he knew he had made contact with the man, he did not think that the man was seriously injured: when the defendant was up and stumbled away, both assailants "bolted" to the automobile. The defendant, thinking the men were "going for something big, like to take me down," scrambled for his telephone, hoping the men would think he was dialing 911 and leave. The men and Abreu then drove away.[5]

iii. *Aftermath of the fight.* On leaving the scene, Rodriguez discovered that Colono had been stabbed. The driver stopped at a convenience store to look for a public telephone.[6] As Rodriguez was shouting for help from people in the area, a woman who was nearby used a cellular telephone to dial 911. An ambulance arrived and took Colono to Beth Israel Hospital while police officers questioned Rodriguez.

Rodriguez told the police that he had picked up Colono at the Pizza Ring and that when Colono entered the automobile, he "keeled over in the back seat." Rodriguez denied witnessing a fight. He also said that Colono had told him he had been "jumped" and stabbed by "a bunch of white guys," and that Colono had "fucked up this drunk white dude." Abreu corroborated Rodriguez's account, telling the police that, while she and Rodriguez were driving down Western Avenue, they discovered Colono enmeshed in a fight with a white man, that

---

[5]At trial, several character witnesses, including college classmates, college professors, and friends, testified that the defendant had a reputation for peacefulness when both sober and intoxicated. See *Commonwealth* v. *Belton*, 352 Mass. 263, 268, cert. denied, 389 U.S. 872 (1967), quoting *Commonwealth* v. *Nagle*, 157 Mass. 554, 554 (1893) ("defendant in a criminal case may put in evidence his general good reputation in regard to the elements of character involved in the commission of the crime charged against him, for the purpose of establishing the improbability of his having done the wrong imputed to him").

[6]In contrast to Rodriguez and Abreu's testimony that Abreu was driving the automobile, one bystander testified that the driver was a man.

they pulled over and saw the man holding a knife, and that Colono got in the back seat and they drove off.[7]

Rodriguez's brother drove Rodriguez and Abreu to the hospital where Colono had been taken; the automobile in which they had been driving had been impounded. At about 3:15 A.M., Colono died. The cause of his death was multiple stab wounds. At the hospital, the alcohol content of Colono's blood measured .082 per cent.

While those events involving Colono and his cohorts were transpiring, other developments were taking place concerning the defendant. Shortly after the fight, at about 1:56 A.M., the defendant dialed 911 and reported that he had "witnessed a young man getting stabbed." He told the 911 operator his location and, when asked whether the victim was with him, said, "No, sir. I just saw it happen. I'm, I'm just a fucking bystander, sir." When asked about the attacker, the defendant said, "Some guy came out of a car in a fucking black jacket, stabbed this other guy. So the guy, he just screamed, 'I've been stabbed,' and that was it."

Shortly thereafter, a police officer responded to the scene and the defendant told him that he had seen a stabbing down the street, and that both the victim and the perpetrators had run away in the same direction. As the officer left to look for the victim and assailants, another officer took over questioning the defendant. The defendant told that officer that he had seen multiple attackers assault a "kid"; the defendant also mentioned something about a stabbing but said he was confused. The defendant had a welt on his forehead and, while rubbing it, claimed he had been injured while trying to help the victim. He told another officer at the scene conflicting stories: first, that no one had been stabbed but, later, that someone had been stabbed and that the defendant had intervened because he had a penknife. The defendant denied needing medical treatment and, after giving the authorities his identification information, was allowed to

---

[7]Rodriguez boasted to his brother that he had "sucker punched" the defendant in the head, that he and Colono had "kicked [the defendant's] ass," and that they had "won" the fight. Rodriguez also told his brother that he was concerned about getting arrested after the fight, but he later admitted to investigators that he had been involved in the fight.

leave. At trial, the defendant testified that he had given officials at the scene incorrect accounts of the fight because he was concussed, he was not thinking clearly, he wanted to go home, and he did not want to press charges for fear that the assailants would come after him.

At 2:41 A.M., the defendant left a message on Hansen's cellular telephone, which was played to the jury:

> "Hey, Jen. How's it going? I just, um, I got attacked. I just got attacked by a group, um — . I fended them off, [inaudible] ha ha. I stabbed him a couple of times and — don't repeat this to police, um, but, yeah. I've got a fucking killer headache. I just walked a couple miles home. I think I've got a concussion. Um, anyway, I had a swell time tonight. I hope you guys, um, made it home . . . okay. Bye-bye."[8]

Several hours later, two police officers went to the defendant's apartment and took him to the Cambridge police station for questioning. The defendant felt "beat up," his jaw and face hurt, he had a "nasty total-body kind of ache," and he had a headache similar to when he had sustained concussions in the past from playing rugby.[9] Over the course of the morning, the headache got worse and focused on the back of his head where he had been hit. On the way to the police station, the defendant, referring to his welt, said — "kind of in jest," according to one of the officers — "You guys must raise them tough around here. They really know how to hit around here."

At the station, the defendant (after waiving his Miranda

---

[8]Questioned about the recorded message that the jury had just heard, Hansen testified that the defendant's voice was "extremely slurred," included "weird pauses," and was at times "incomprehensible"; she also said that, knowing how the defendant normally sounded when he laughed, the "ha ha" sound on the telephone message was not laughter but was a sort of "guttural" throat sound. As for the defendant's request that Hansen not telephone the police, the defendant testified that, while he did not remember having contacted Hansen, he was "sure I was afraid that" Hansen would "freak out," "call the police," and "get everybody involved," and the last thing the defendant wanted was to involve his assailants. The defendant denied telling any friends to hide anything from the authorities.

[9]At trial, Olmstead was shown a photograph of the defendant taken after the fight; she testified that the defendant's face and eyes appeared swollen.

rights) told the officers that, while walking down Western Avenue earlier in the morning, he saw "some dudes sitting and leaning up against a car," one of whom was white or Hispanic. The defendant passed them, turned around, saw a scuffle, and went to "help break it up." As the defendant approached the fight — which involved two "guys" against one "kid" — one of the attackers told the defendant, "Fuck off, bitch," and "popped" the defendant in the head. One of the assailants then pulled a knife and "someone" got stabbed. The defendant then walked away and dialed 911. Several times during the interview, the defendant said that he was "really drunk last night."

After the defendant gave that statement, a third police officer informed the defendant that Colono had died. The defendant responded, "I'm sorry, sir. I'm sorry, sir. I lied to those guys," meaning (according to the defendant) that he had lied to the other officers about how the fight had happened and about having been "really drunk."[10] He subsequently told the police that he had sustained concussions in the past from playing rugby, but denied needing medical attention. At about 8:30 A.M., the defendant was placed under arrest.

After he was booked, the defendant complained of a headache and an emergency medical technician (EMT) took him to Cambridge City Hospital. He told the EMT that he had been punched in the head; that, after the incident, his vision was spotty; that he had a history of concussions; and that he believed he might have sustained a concussion from the fight. At the hospital, he told a physician that he had been kicked and punched, but the physician saw no signs of head or neck trauma. Thereafter, the defendant was taken back to jail.

The following day, the defendant returned to the hospital, complaining of a headache, nausea, dizziness, and vomiting. During that visit, the defendant told the same physician he had seen the previous day that he had been struck in the head with a fist or blunt object and had lost consciousness for several seconds. The physician again concluded that there were no signs of head injury. The symptoms that the defendant reported

---

[10]At trial, the defendant explained that, on learning of Colono's death, he told the police he was "sorry" because he "couldn't believe it . . . it was very shocking. It was very shocking and I felt horrible."

were similar to those he had experienced when he had sustained concussions from playing rugby. According to Dr. David Ross, a physician who had treated the defendant for those earlier concussions, the defendant then complained of headache, confusion, dizziness, blurred vision, and loss of memory — among the most common symptoms of concussions.[11] Dr. Ross also testified that there usually are no external signs of a concussion.

Another physician, Dr. Jeremy Schmahmann, had not examined the defendant but, based on reviews of the defendant's medical history and the testimony of the medical and police personnel who had interviewed the defendant after the fight, concluded that the defendant's symptoms were consistent with a concussion. He also testified that the physician who had examined the defendant at Cambridge City Hospital did not perform all of the possible tests used to diagnose a concussion. Finally, Dr. Schmahmann explained that fatal trauma can be caused by being beaten in the head with fists or by being kicked in the head.

We now summarize the evidence proffered by the defendant that was excluded by the judge at trial.

b. *Evidence of violent histories of Colono and Rodriguez.* Based on the defendant's witness list, which included numerous people who had knowledge of Colono and Rodriguez's violent backgrounds, the Commonwealth filed a pretrial motion in limine to prevent the defendant from introducing any evidence to show that either Colono or Rodriguez had violent propensities.[12] In reply, defense counsel acknowledged that Massachusetts law at the time did not permit him to introduce

---

[11]College classmates who had played rugby with the defendant testified that when the defendant experienced concussions from rugby games, he would complain about dizziness, some vision loss, headache, and confusion; he would slur his words; his speech would become "jumbled," i.e., the defendant would stop and start in mid-sentence; and he would seem "inappropriate," i.e., he "giggled" at having been struck in the head.

[12]Witnesses on the defendant's list had knowledge of the following information. With respect to Colono, his criminal history included convictions of possession of cocaine with intent to distribute and malicious destruction of property. Regarding the latter offense, Colono had tried to leave a restaurant without paying, threw money in the face of a cashier, and kicked the restaurant's glass front door, shattering it. Colono was also charged with trespassing, in connection with which he had behaved belligerently toward the

Colono or Rodriguez's prior bad acts for propensity purposes where the defendant did not know of those acts, but argued that the evidence would be admissible under existing evidentiary rules, such as those regarding impeachment and state of mind. Following a hearing, the judge precluded the defendant from mentioning Colono's prior convictions or other bad acts in opening statements; she instructed the defendant that he could refer to Rodriguez's record "very sparingly," concluding: "We will see what happens during the course of the evidence."[13]

Once the trial was under way, defense counsel, while cross-examining Rodriguez, sought to explore whether Colono had violent tendencies — counsel elicited from Rodriguez that Colono was "hot headed," and counsel asked Rodriguez whether Colono "would make comments to people, and then there would be trouble." The prosecutor objected, and during a sidebar discussion defense counsel claimed that his line of questioning was relevant to Colono and Rodriguez's states of mind, and who during the fight "instantly" had the "upper hand." The prosecutor complained that the evidence sought to be elicited was inadmissible prior bad acts evidence for propensity purposes. The judge allowed defense counsel limited questioning regarding Rodriguez's state of mind. Defense counsel's subsequent questioning

arresting officers and threatened that he "was going to have his 'Lion Boys' take [the officers] out." Rodriguez was convicted of the following: assault and battery (he grabbed a former girl friend by the throat and punched her in the face); assault and battery by means of a dangerous weapon and malicious destruction of property (he participated with others in throwing eggs at an automobile, using bicycles to smash the automobile's windows and dent the hood, and throwing the bicycles at the occupants of the automobile); illegal firearm possession and resisting arrest (during a police chase of Rodriguez arising from an officer's suspicion that he was illegally carrying a firearm in public, Rodriguez pulled out a gun as he was tackled; he briefly struggled during the arrest); assault and battery by means of a dangerous weapon and simple assault and battery (during an argument, Rodriguez threw a telephone at his sister, nearly hitting her, and struck his sister in the eye with a plastic baby cup; when Rodriguez's sister's husband confronted him about what had happened, Rodriguez pushed his brother-in-law, wrestled with him, got a knife from the kitchen, and swung and jabbed at him; Rodriguez then smashed the windows of his sister's automobile with a hammer).

[13]During opening statements, defense counsel briefly mentioned Rodriguez's convictions, without mentioning the facts underlying them. Those convictions were entered in evidence at trial, as was Colono's drug conviction, but for impeachment purposes only.

of Rodriguez elicited no testimony regarding any specific violent acts of Colono or the violent reputation of Colono.

Later during cross-examination of Rodriguez, defense counsel made an offer of proof, seeking permission to introduce evidence that Rodriguez had told a defense investigator that Colono had never lost a fight except one with his brother. Counsel called the matter "critical in this case," saying that it related to "[w]ho was the first aggressor . . . the believability of whether [the victim] would wait for [the defendant] to open the door to the car before flying out." Counsel also sought to explore Colono's "street fighting ability as compared to [the defendant's]." "[T]he issue is who started it, whether [the defendant] was the initial aggressor, whether [the victim] was, whether it's reasonable to assume that given that it started as a fight that [the defendant] immediately had the upper hand." The prosecutor again complained that counsel was attempting to introduce improper propensity evidence, and the judge did not allow counsel to introduce evidence regarding Colono's fighting abilities.

Finally, shortly before defense counsel cross-examined Rodriguez's brother, the prosecutor complained that counsel wished to pursue a line of questioning regarding whether Rodriguez and Colono "grew up fighting." The judge concluded: "History of combative prior acts of combat or fighting? That's not coming in. Characterizations are not coming in."

We turn now to consider the legal claims on appeal.

2. *Propriety of the Commonwealth's appeal.* The defendant has moved to dismiss the Commonwealth's appeal, arguing that no appeal lies from the allowance of a motion for a new trial under Mass. R. Crim. P. 25 (b) (2). To be sure, the defendant cited rule 25 (b) (2) in his motion for a new trial, and the judge cited that rule in her decision. But the substance of the motion was more in the nature of one filed under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). Rather than claiming that the verdict was against the weight of the evidence, the defendant challenged the fairness of the trial on the ground that he was unable to introduce evidence relevant to his self-defense theory. See *Commonwealth* v. *Preston*, 393 Mass. 318, 322-324

(1984) (pleadings to be treated according to nature and substance rather than technical form); *Commonwealth* v. *Cornish*, 28 Mass. App. Ct. 173, 178-179 (1989) (treating rule 25 [b] [2] motion as rule 30 [b] motion where judge was concerned about trustworthiness of evidence, fairness, and interests of justice rather than about verdicts being against weight of evidence). Pursuant to Mass. R. Crim. P. 30 (c) (8), as appearing in 435 Mass. 1501 (2001), the Commonwealth may appeal from the allowance of a motion for a new trial under rule 30 (b). See *Commonwealth* v. *Powers*, 21 Mass. App. Ct. 570, 571-572 (1986) (treating defendant's postverdict motion for mistrial as rule 30 [b] motion, and thus recognizing Commonwealth's right of appeal under rule 30 [c] [8]). The Commonwealth's appeal is properly before us.

3. *Propriety of the order granting the defendant a new trial.* A judge may grant a new trial under rule 30 (b) "at any time if it appears that justice may not have been done."[14] See *Commonwealth* v. *Pope*, 392 Mass. 493, 497 (1984). "[T]he granting of a new trial is a decision firmly committed to the sound discretion of the trial judge [who] has the advantage of firsthand evaluation of the witnesses and the evidence at trial. . . . Our task is only to ensure that there exists in the record before us evidence to support the judge's decision to order a new trial" (citations omitted). *Commonwealth* v. *Preston, supra* at 324. "[T]he judge's ruling will be affirmed unless 'no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her].' " *Commonwealth* v. *Candelario*, 446 Mass. 847, 858 (2006), quoting *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004). Reversal for abuse of discretion is "extremely rare." *Commonwealth* v. *Johnson*, 13 Mass. App.

---

[14]Although the defendant cited Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), in his motion for a new trial, and the judge cited that rule in her memorandum of decision, we treat the matter under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), for the reasons discussed above. A judge has similar broad discretion to grant a new trial in the interests of justice under both rules. See *Commonwealth* v. *Doucette*, 408 Mass. 454, 455-456 (1990) (judge has discretion under rule 25 [b] [2] to grant new trial where integrity of verdict suspect); *Commonwealth* v. *Pope*, 392 Mass. 493, 497 (1984) ("In deciding whether to grant a motion for a new trial, the question [under rule 30(b)] whether 'justice may not have been done' at trial is left largely to the discretion of the judge who presided over the case").

Ct. 10, 19 (1982). Having reviewed the entire case, we conclude that the judge did not abuse her discretion in granting the defendant a new trial.

The relevant law concerning self-defense is as follows. "[T]he right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault unless that person withdraws in good faith from the conflict and announces his intention to retire." *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). Even if a defendant does not initiate the fight (or withdraws after initiating it), where he uses deadly force — as the defendant did here by stabbing Colono with a knife, see *Commonwealth* v. *Toon*, 55 Mass. App. Ct. 642, 644 n.3 (2002) — the defendant is not entitled to an instruction on self-defense unless there is "evidence warranting at least a reasonable doubt" that he "(1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case."[15] *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980), citing *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978). In determining whether a defendant is entitled to a jury instruction on self-defense, "all reasonable inferences should be resolved in favor of the defendant, and, no matter how incredible his testimony, that testimony must be treated as true." *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998).

We now apply those legal principles to this case. The identity of the first aggressor was hotly contested at trial. In her opening statement, the prosecutor repeatedly asserted that, when the defendant approached the automobile, he had his knife "ready"; that the defendant opened the automobile door; and that Abreu, Rodriguez, and Colono drove away after the fight because they did not want the police to blame them "for what [the defendant]

---

[15]The use of excessive force in self-defense can, if the other requisites of self-defense are satisfied, mitigate the killing and reduce it from murder to manslaughter. See *Commonwealth* v. *Toon*, 55 Mass. App. Ct. 642, 645 n.4 & 655 n.17 (2002), and cases cited.

had started." Defense counsel, in his opening, claimed that the defendant was not holding the knife when he approached the automobile; did not touch the door; and was walking away from the automobile when one of the men "explode[d] out," accompanied immediately thereafter by the other man.

During the presentation of the evidence, the prosecutor specifically elicited testimony from Rodriguez and Abreu to substantiate the idea that the defendant had started the fight, while defense counsel specifically elicited testimony from the defendant to support the notion that Rodriguez or Colono had started it. And in closing argument, each party emphasized its view of how the fight began: the prosecutor repeatedly said that the defendant became the aggressor by opening the automobile door, while defense counsel reiterated his theme that the defendant had acted in self-defense.

The Commonwealth argues that, questions of first aggressor aside, the defendant's self-defense theory necessarily fails — i.e., that he was not entitled to a jury instruction on self-defense — because the jury could not, as a matter of law, have formed a reasonable doubt concerning any of the three *Harrington* factors discussed earlier. We disagree. Under the defendant's version of the fight — which we must accept for purposes of examining whether he was entitled to an instruction on self-defense, see *Commonwealth* v. *Pike, supra* — one of the men "came right out" of the automobile and punched him; the defendant tried to stop the assailant but a second man immediately joined the fight, hitting the defendant from behind; the next thing he knew, the defendant was on the ground trying to cover his head; Colono and Rodriguez were of comparable size and weight to the defendant, and Rodriguez was muscular and worked as a bouncer; the defendant was being "pound[ed] . . . over, and over, and over"; nobody else was present to help the defendant; he thought he could not escape the beating and thought his assailants were going to beat him unconscious or kill him; he used his knife in order to get the assailants away from him; he suffered a welt on his forehead and his face was swollen; and a medical expert testified that the defendant's symptoms following the fight were consistent with a concussion, and that fatal trauma can be caused by being beaten in the head with fists.

In light of that evidence, the jury could have formed a reasonable doubt about the defendant's duty to retreat, see *Commonwealth* v. *Pike*, *supra* at 398-399; the reasonableness of his belief that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force; and that he used no more force than was reasonably necessary in the circumstances. Compare *Commonwealth* v. *A Juvenile*, 17 Mass. App. Ct. 988, 989-990 (1984) (defendant entitled to self-defense instruction where victim and victim's brother attacked defendant; defendant drew knife only when second assailant was at his back; defendant intended to use knife to fend off rather than stab), with *Commonwealth* v. *Ramos*, 66 Mass. App. Ct. 548, 554-555 (2006) (defendant not entitled to self-defense instruction where victim alone punched defendant, using only "bottom of his fists"; no indication victim hit defendant with degree of force likely to cause serious bodily harm; defendant had no injuries).

Because the evidence allowed the jury to form a reasonable doubt about each of the *Harrington* prerequisites for self-defense, the question of who was the first aggressor — the threshold prerequisite for self-defense — was key. Thus, we now consider how the defendant and the judge addressed that question.

Having carefully reviewed the record, it is apparent that the defendant sought, albeit unsuccessfully, to capitalize on evidence of Colono and Rodriguez's violent pasts for purposes of establishing that one or the other was the first aggressor. To support his self-defense theory, the defendant assembled a list of witnesses who had knowledge of numerous prior violent acts of Colono and Rodriguez. See note 12, *supra*. He also attempted at various turns during trial (set forth in detail above) to introduce evidence of Colono and Rodriguez's fighting histories and abilities. The judge, however, prevented him from introducing such evidence. In light of those various attempts by the defendant to introduce evidence of Colono and Rodriguez's violent predispositions, we reject the Commonwealth's argument that the defendant failed to raise the matter at trial.

We therefore turn to consider whether the judge abused her discretion in granting the defendant a new trial. After the

defendant was convicted and sentenced but before his appeal — and thus before his conviction became final — we released our opinion in *Commonwealth* v. *Adjutant*, 443 Mass. 649 (2005). In that case, we announced a new rule granting trial judges the discretion in self-defense cases to admit prior bad act evidence of victims — even if unknown to the defendant — for purposes of illuminating the identity of the first aggressor. See *id.* at 664. Although we said in *Adjutant* that the new rule announced there applies prospectively, we applied it to Adjutant herself, noting that the identity of the first aggressor was paramount in her case; that she had sought at trial to introduce evidence of the victim's prior violent acts to address the first aggressor question; and that she had pressed the matter on appeal. We reasoned that, "[g]iven the probative value of the excluded evidence, it may have been enough to create reasonable doubt of the defendant's guilt." *Id.* at 666. Those factors led us for the first time to apply a new rule of criminal law, not constitutionally mandated, to the defendant before us, even though we said in the decision that the new rule would apply prospectively. Cf. *Commonwealth* v. *Dwyer, ante* 122, 124, 147 (2006); *Commonwealth* v. *King*, 445 Mass. 217, 248 (2005); *Commonwealth* v. *Dagley*, 442 Mass. 713, 720-722 & n.10 (2004), cert. denied, 544 U.S. 930 (2005). In this case, in ruling on the defendant's motion for a new trial, the judge similarly concluded that the "integrity of [the] verdict is suspect where the jury did not have the benefit of relevant evidence critical to the issue of whether the defendant was the aggressor or whether he was acting in self-defense."

Our review of the judge's decision in this case is limited to whether she abused her discretion. See Mass. R. Crim. P. 30 (b). We cannot say that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her]." *Commonwealth* v. *Candelario*, 446 Mass. 847, 858 (2006). The defendant was in the same shoes as Adjutant in that, in both cases, the defendants attempted to introduce evidence of the victims' violent propensities, and both pursued the matter before their convictions had become final through direct appeals. As in *Adjutant*, in this case the identity of the first aggressor was essential, and the defendant sought aggressively and repeatedly ("every which way," according to the prosecutor) to introduce

evidence of Colono and Rodriguez's violent histories to illuminate the matter. At each turn the judge rejected those attempts. Where the defendant had persistently attempted to introduce evidence of Colono and Rodriguez's violent histories to support the central issue at trial — whether he had acted in self-defense — and where the defendant's conviction had not yet become final when he moved for a new trial, we cannot say that the judge's conclusion that "fairness require[d]" granting the defendant a new trial was an abuse of her broad discretion to see that justice is done. See Mass. R. Crim. P. 30 (b).

4. *Matters to be resolved at retrial.* a. *Propensity evidence.* We leave to the sound discretion of the judge the kinds of evidence of prior violence that she may admit at retrial. See *Commonwealth* v. *Adjutant, supra* at 663. As to the victim, *Adjutant* establishes the appropriate guidance: the judge may admit evidence of Colono's specific acts of prior violent conduct but may not admit evidence of his general reputation for violence. See *id.* at 664-665.

As for evidence of Rodriguez's prior violent acts, we conclude that the same principles should apply to Rodriguez. Although he is not a victim in this case, Rodriguez assisted the victim in the fight. In fact, according to the defendant's view of the evidence, Rodriguez might have started it. The facts of *Adjutant* involved an altercation involving only two people — the victim and the defendant. See *id.* at 650-652. But nothing in *Adjutant* precludes a judge from admitting evidence of prior acts of violent conduct of a victim's cohort. Cf. *People* v. *Robinson*, 163 Ill. App. 3d 754, 773-774 (1987), and cases cited (discussing use of third-person character evidence to show identity of aggressor). Because Rodriguez played a central role in the fight here, and because the purpose of the *Adjutant* rule is to give the jury a full picture of the altercation so as to make an informed decision about the identity of the initial aggressor or aggressors (where there is evidence that one or more aggressors jointly initiated the fight with a defendant), evidence of Rodriguez's specific acts of prior violent conduct is admissible. Before admitting evidence of specific examples of a third party's violent acts, the judge should determine whether, in the light most favorable to the defendant, the third party was acting in concert with or to assist the victim.

Before retrial, the defendant shall, in accordance with *Adjutant,* provide the court and the Commonwealth timely notice of the specific evidence he intends to offer (he is not limited to those violent acts that he sought to introduce at his first trial), and the Commonwealth shall provide the court and the defendant notice of whatever rebuttal evidence it intends to offer. See *Commonwealth* v. *Adjutant, supra* at 665-666. The judge may then exercise her sound discretion with regard to the admission of such evidence. See *id.* at 663.

b. *Unavailable witness.* At trial, the defendant sought to call as a witness Anthony Lewis, who had witnessed the fight between Rodriguez and Abreu at Rodriguez's mother's apartment on the night in question. In addition to having purportedly seen Rodriguez beat Abreu, Lewis temporarily secreted Rodriguez in Lewis's apartment when the police arrived; lied to the police about Rodriguez's whereabouts; and saw Rodriguez and Abreu sniff cocaine that Rodriguez had brought with him to Lewis's apartment. Lewis made those allegations in an affidavit, but later claimed that he had signed the affidavit without the advice of counsel. The defendant hoped to elicit from Lewis testimony consistent with the affidavit.

Lewis informed the judge that he wished to invoke his rights under the Fifth Amendment to the United States Constitution, and the judge appointed counsel for him. Following a colloquy with counsel, the judge concluded that Lewis had a valid Fifth Amendment privilege. The defendant then requested that the judge either grant Lewis immunity or admit the statements Lewis had made in his affidavit without Lewis testifying, on the ground that his statements were made against his penal interest. The judge denied both requests.

With respect to Lewis's invocation of his Fifth Amendment rights, the judge did not inquire whether, despite Lewis's not having had the advice of counsel, he nonetheless signed the affidavit "freely and voluntarily." See *Commonwealth* v. *Slonka,* 42 Mass. App. Ct. 760, 769 (1997). Accordingly, on retrial, if Lewis again claims a Fifth Amendment privilege, the judge shall hold a hearing to determine whether Lewis "freely and voluntarily" signed the affidavit, thereby "forfeit[ing] his privilege against self-incrimination." *Id.* at 769. We thus express no opinion about the admissibility of any statements of Lewis.

5. *Conclusion.* The judge did not abuse her discretion in granting the defendant a new trial. Her order to that effect is affirmed. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*