COMMONWEALTH *vs.* HASSAUN HARRIS.

Suffolk. October 5, 2012. - February 12, 2013.

Present: IRELAND, C.J., SPINA, CORDY, GANTS, & DUFFLY, JJ.

*Homicide. Evidence,* Relevancy and materiality, Self-defense. *Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to jury. *Self-Defense.*

At a murder trial, the judge did not commit palpable error in admitting in evidence, over the defendant's objection, a recording of a telephone call made by the victim in which he stated that he had been stabbed, where the recording bore on the issue whether the victim's deadly injury derived from a stabbing, a fact to which the defendant did not stipulate [430-431]; further, in the circumstances, it was not improper for the prosecutor to play the recording for the jury during his closing argument, and in so doing, the prosecutor did not improperly appeal to jury sympathy [431-432].

At a murder trial, the judge correctly instructed the jury on self-defense and appropriately left the matter for determination by the jury [432-433]; moreover, the instructions as a whole properly placed the burden on the Commonwealth to prove an unlawful killing [433-435], and in the circumstances, no prejudice could be said to have arisen from the failure of the challenged instruction to differentiate between verbal and physical provocation in the context of who was the initial aggressor [435-436].

INDICTMENT found and returned in the Superior Court Department on December 28, 2006.

The case was tried before *Christine M. McEvoy,* J.

*Leslie W. O'Brien* for the defendant.

*Donna Jalbert Patalano,* Assistant District Attorney (*Ian Polumbaum,* Assistant District Attorney, with her) for the Commonwealth.

IRELAND, C.J. On February 4, 2008, a jury convicted the defendant, Hassaun Harris, of murder in the first degree on the theory of deliberate premeditation. Represented by new counsel on appeal, the defendant argues error in (1) the admission of evidence; (2) the prosecutor's closing argument, and (3) the judge's instructions to the jury. The defendant also seeks relief

pursuant to G. L. c. 278, § 33E. We affirm the defendant's conviction and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Facts.* As an initial matter, the defendant admitted that he had stabbed and killed the victim during an argument. The main issue at trial was whether the defendant had acted in self-defense.

a. *The Commonwealth's case.* We summarize the facts the jury could have found, reserving certain details for discussion in conjunction with specific issues raised. After a long relationship that developed into dating and cohabitation, the defendant and Tanetta Williams ended their relationship in March or May of 2006. After the breakup, however, Williams kept in contact with the defendant because she helped take care of his son. She also continued to manage the defendant's finances and was a "payee" for payments he received due to an illness.

Shortly after 9 P.M. on October 12, 2006, Williams and the victim,[1] who was a friend, drove to a restaurant in the Hyde Park section of Boston. Williams and the victim went to the counter inside the restaurant, and Williams ordered some food. She and the victim found a booth across from the register, sat down, and proceeded to use their cellular telephones.[2] At 9:20 P.M., Williams received a call from the defendant. Williams testified that the telephone call was brief because she "was on the other line." The defendant only relayed that he needed to talk to her.

Sometime after 9:30 P.M. the defendant entered the restaurant through the front door and went over to Williams and the victim. The witness accounts of what next occurred vary.[3]

---

[1]The victim was a large man, weighing about 265 pounds and was six feet, one inch tall. In contrast, the defendant was approximately between five feet, seven inches and five feet, eight inches and weighed about 230 pounds.

[2]One employee, Theresa Hazard, testified that she overheard Williams speaking on a cellular telephone and arguing with the person to whom she was speaking. The restaurant manager, during her cross-examination, however, did not dispute that she had testified before the grand jury that, when Williams was speaking on her cellular telephone, she spoke in a regular tone.

[3]There were several surveillance cameras in the restaurant, and the footage, which did not display a sharp image, was admitted in evidence. Not all cameras were focused on the area where the incident transpired. In the footage that recorded images of the defendant and the victim, physical obstructions prevented a continuous view of the incident.

The manager of the restaurant, Bonita Joyner, overheard the defendant say to Williams, "Is this this nigger you was talking shit to me about." The victim stood up. Both men made "reaching gestures" into their pants "like they had guns and stuff." Seeing this, the manager and the employee on the grill went to the back of the store. The manager, however, could still see and watched as the defendant and the victim moved about. Just after the men moved out of her sight, the manager heard a groan. She then heard the side door of the restaurant open. The manager went outside to the parking lot to check on an employee who had been taking a break. She saw Williams in front and saw the defendant leaving the parking lot in an automobile.

Korey Maurice Lungelow had been working on the grill when he saw the defendant enter the restaurant. He saw the defendant approach and say something to Williams, but he could not hear what was said. The victim stood up and reached with one hand toward his back pocket. The defendant said, "Let's go outside" and "Let's shoot the fair one," which Lungelow understood to mean having a "fair fight with fists." Lungelow injected, saying, "You can't do that in here." The defendant headed to the front door. He turned around and "charged" the victim. The victim moved back and Lungelow's view was obscured. He next saw the defendant "tackle" the victim. Again, the men went out of sight. Lungelow heard a male voice yell. He never saw either man again.

Another employee, Theresa Hazard, had been outside on a break when the defendant came into the restaurant. From her truck, she saw the defendant attacking the victim. The victim was running away from the defendant. As the men came out of the side door of the restaurant, the victim had his hands on the upper body of the defendant. The defendant was making movements with his right hand, as if he had something in his hand. Hazard testified that it looked like the defendant made contact with the victim in the back. She saw the victim grab his stomach and slouch down. The men came apart. The victim went behind her truck and headed toward another building. The defendant yelled to Williams, "I told you, I told you, how are you going to sit there and talk about me." Williams did not respond. The defendant jumped into an automobile and drove off. Williams got into an automobile.

Williams also testified, recounting that when the defendant came over to talk to her, the victim told the defendant he was not going to talk to him and asked him whether he had come to start a fight. The defendant stated, "I am not talking to you. I am talking to [Williams]." The defendant turned to Williams and asked, "So, that's [the victim]?" The victim stood up and asked, "Did you come here to fight or what?" The defendant replied, "We can fight if you want."

Williams got up and placed herself between the defendant and the victim. She asked the defendant to leave and the victim to be quiet. The men continued their banter about fighting. The defendant, followed by the victim, headed to the side door. Williams walked away. The men "positioned themselves like they were going to fight." Each made a gesture toward their pockets.[4] The men moved toward the side door. As they did, the victim took "a swing" at the defendant. Once outside, the victim took off running. Williams returned inside to collect her belongings and then left in her automobile to look for the victim. As she left, the defendant was standing in the parking lot.

A short distance later, Williams saw the victim running across the street. He was holding his chest and appeared to be having a difficult time breathing. He stumbled inside a nearby restaurant.

Inside the restaurant, the victim said, "I've been stabbed." He rested on a counter and then fell backwards, hitting his head on the floor. One of the patrons rushed to help the victim. He found a faint pulse, but the victim was not responding. The patron's wife telephoned 911. Williams ran into the restaurant and was hysterical. The victim was transported to a nearby hospital, where he was pronounced dead.

The victim suffered two stab wounds, one to his left front shoulder and one to his chest, and a cut to his abdomen. He died as a result of the stab wound to the chest with penetration of the heart.

When police first questioned Williams about the victim's injuries, she lied about what had occurred and said she and the victim had not been to the restaurant that evening. Although she

---

[4]What the gesture was is not discernable from the record. Williams's testimony on the matter was: "[The victim] did his pockets like that," and "[The defendant] did his pockets like that."

provided police with a physical description of the person who had injured the victim, she did not provide them with a name and did not indicate that she knew him. In a subsequent interview with Williams, after police informed her that the victim had died, Williams gave an account of the incident at the restaurant.

Eventually, on November 2, 2006, the police apprehended and arrested the defendant. He was staying at the apartment of a female friend. During his booking, he asked a police officer whether his friend was going to "get in trouble," and added, "She doesn't know what I did."[5]

b. *The defendant's case.* The defendant testified. He maintained that, at the time of the stabbing, he and Williams were still a "couple" and lived together. He had never met the victim, but knew that the victim had called the apartment for Williams.[6] The defendant left work on October 12, 2006, to exchange automobiles with Williams at her request. He was caught off guard when he found Williams with the victim inside the restaurant because Williams had told him she would be with her mother. He immediately focused his attention on Williams, asking her questions about her mother. The victim asked him, "So, you're [Harris]," and asked whether the defendant wanted to fight. When the defendant did not answer him, the victim stood up.

The victim repeatedly asked the defendant whether he wanted to fight. As he did, the victim moved his right hand to his back pocket or under his shirt. The victim threatened to shoot the defendant. The defendant said, "Whoa, hold on." Williams stood up between the two men and pushed the victim back. The defendant, having observed the size of the victim and believing the victim's threat and that he indeed did have a gun, felt scared and believed the victim "was going to do something to [him]."

---

[5]After these statements were admitted, the judge gave a limiting instruction that it is the Commonwealth's burden to prove, beyond a reasonable doubt, that the defendant made the statements and made them voluntarily, freely, and rationally.

[6]According to the defendant, Williams assured him that the victim's telephone calls were work related. The defendant returned the victim's telephone call, only to get connected to an answering service. At some point, the victim telephoned the defendant and laughed and told him to stay out of his business. The defendant did not recall receiving a fifteen-minute telephone call from the victim three days before the stabbing.

The defendant told the victim that he did not have a problem with him and then moved toward the door. The victim moved around the defendant, and the defendant could not see the victim's hand. The victim asked to fight and suggested they go outside. The defendant heard the victim say something about shooting him (the defendant) three times.

By the side door, the victim kept asking the defendant whether he wanted to fight. The defendant replied, "We could fight, but we don't have to do nothing else. If you want to fight, we can fight." The victim insisted on going outside. The defendant refused. Then, the victim swung at the defendant. The defendant rushed at the victim and unsuccessfully attempted to pick him up. The victim punched the defendant twice in the head. After, the victim, with both of his hands, grabbed the defendant by the throat. He also kicked the defendant, used a racist slur, and said, "Wait until we get outside." The defendant had no memory of taking out his fishing knife and stabbing the victim with it. He recalls that the tussle moved outside and that, once they were outside, the victim ran one way, and he (the defendant) drove off in his automobile in the opposite direction. He was nervous and shaken up. His fishing knife was gone.[7] The defendant did not know that the victim was hurt, but learned later that night that he had died. He fled to Providence, Rhode Island.

The defendant's trial counsel argued that the defendant properly acted in self-defense and that the jury should return a verdict of not guilty. The judge instructed the jury on (1) murder in the first degree based on the theory of deliberate premeditation; (2) murder in the second degree (including all three prongs of malice); and (3) voluntary manslaughter on the basis of heat of passion on reasonable provocation, heat of passion induced by sudden combat, and the use of excessive force in self-defense. She also instructed on self-defense as a complete defense.

2. *Admission of evidence.* Over the defendant's objection, a 911 recording of the victim was admitted in evidence and played to the jury. The recording was short. In it, the victim three times

[7]The defendant's stepfather testified on his behalf. He recalled that the defendant had fishing rods and tackle boxes and had used a pocket knife in 2006.

stated: "I've been stabbed." The operator asked where he was, and there were no further replies. The defendant argues on appeal that the admission of this recording was erroneous because it was not relevant and improperly evoked sympathy.[8]

"We entrust questions of relevancy and prejudicial effect to the sound discretion of the trial judge, whose determinations we will not disturb except for 'palpable error.' " *Commonwealth* v. *Carey*, 463 Mass. 378, 388 (2012), quoting *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010). Here, while the defendant may not have contested the fact that he stabbed the victim, he did not stipulate to that fact, thereby relieving the Commonwealth of its burden of proving an unlawful killing. The defendant testified that he had no memory of taking out or using a knife during the altercation with the victim. None of the witnesses saw a weapon. The exterior entry point of the lethal wound to the victim was not visible to the medical examiner because a procedure performed by emergency medical responders "cut through the stab wound."[9] Thus, the recording bore on the fact that the victim's deadly injury derived from a stabbing. The judge did not commit palpable error in admitting the recording.

3. *Prosecutor's closing argument.* The defendant suggests that the prosecutor improperly attempted to evoke sympathy from the jury by playing, during his closing argument, the 911 recording of the victim stating three times he had been stabbed. Because the defendant objected to the closing on this ground, we review to determine whether "substantial rights were . . . affected." Commonwealth v. *Simpson*, 434 Mass. 570, 584 (2001), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). We conclude they were not.

As has been stated, the recording properly had been admitted in evidence, and the jurors were free to listen to it during their deliberations as a trial exhibit. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 305, cert. denied, 493 U.S. 940 (1989). Playing the recording itself did not misrepresent the evidence. To the

[8]The defendant does not challenge the judge's ruling that the victim's hearsay statements on the recording were admissible as dying declarations and excited utterances.

[9]The medical examiner's internal examination discovered evidence of this stab wound.

extent that the content of the recording was upsetting or inflammatory, that was inherent in the nature of the act (a stabbing) committed. The judge repeatedly instructed the jury that they may not decide the case based on any sympathy, including sympathy for the deceased. In the circumstances, we conclude that it was not improper for the prosecutor to play the recording for the jury during his closing argument and that in so doing the prosecutor did not improperly appeal to jury sympathy. See *Commonwealth* v. *Semedo*, 456 Mass. 1, 13 (2010) ("In closing argument, a prosecutor may analyze the evidence . . .").

4. *Self-defense instructions.* a. As an initial matter, contrary to the Commonwealth's contention, the evidence, viewed in the light most favorable to the defendant, see *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980), required the judge to instruct the jury on self-defense. When deadly force is used, as the defendant did here by stabbing the victim (inferentially with a knife), a defendant is entitled to an instruction on self-defense where there is " 'evidence warranting at least a reasonable doubt' that he '(1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case.' " *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 733 (2007), quoting *Commonwealth* v. *Harrington, supra.* "In determining whether a defendant is entitled to a jury instruction on self-defense, 'all reasonable inferences should be resolved in favor of the defendant, and, no matter how incredible his testimony, that testimony must be treated as true.' " *Commonwealth* v. *Pring-Wilson, supra*, quoting *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998).

Here, based on his own testimony, the defendant believed that the victim possessed a gun and was going to shoot him. This belief derived not only from a gesture by the victim, see *Commonwealth* v. *Wallace*, 460 Mass. 118, 125 (2011) (gesture of lifting shirt alone insufficient to raise self-defense claim), but also from the victim's saying three times something to the effect that he was going to shoot the defendant, see *Com-*

*monwealth* v. *Little*, 431 Mass. 782, 786 (2000) (evidence that defendant believed victim, whom he knew carried gun in past and had made gesture of reaching for gun at his hip, permitted self-defense instruction). Contrast *Commonwealth* v. *Fisher*, 433 Mass. 340, 353 (2001) (no evidence defendant reasonably feared for his life because no evidence that victim was armed or that defendant believed he was armed; victim's posture alone insufficient). This evidence would permit the jury to find that the defendant had a reasonable and actual belief that he was in imminent danger of being killed or seriously injured with no reasonable means of escape. See *Commonwealth* v. *Little, supra.* Further, pursuant to the defendant's version of the incident, the jury could have found that the defendant did not use his knife until the victim grabbed his (the defendant's) throat with both hands, thereby rendering the defendant unable to retreat. See *Commonwealth* v. *Pring-Wilson, supra* at 734-735 (defendant entitled to self-defense instruction where there was evidence that he thought he could not escape beating and used knife to get assailants away from him). See also *Commonwealth* v. *Benoit*, 452 Mass. 212, 227 (2008) (duty to retreat "does not impose an absolute duty to retreat regardless of personal safety considerations; an individual need not place himself in danger nor use every means of escape short of death before resorting to self-defense"). Last, there was evidence that the victim was much larger in size than the defendant and evidence of one cut and two stab wounds (only one of which was lethal) to the victim. From this evidence, the jury could have permissibly found that the defendant did not use any more force than was reasonably necessary in the circumstances. See *Commonwealth* v. *Harrington, supra.* Thus, the judge correctly instructed the jury on self-defense and appropriately left the matter for determination by the jury.

b. In instructing the jury on self-defense, the judge's instruction, with one exception, mirrored the self-defense instruction set forth in the Model Jury Instructions on Homicide 55-58 (1999).[10] At the Commonwealth's request, the judge included the following:

"A person who provokes or initiates an assault ordinarily

---

[10]The Commonwealth contends that the judge omitted a portion of the self-

cannot claim the right of self-defense unless he withdraws in good faith from the conflict and announces his intention to retire. Those are obviously factual questions for you to determine."

At the end of the charge, the defendant objected to this portion of the instruction. The objection was overruled. The defendant argues on appeal that this portion of the charge incorrectly conveyed that the right to self-defense would be lost to a person who provokes by speech as opposed to violence or threats of violence. The effect of the instruction, he contends, was to remove his sole defense from the jury's consideration and relieve the Commonwealth of its burden of proving one of the elements of murder, namely, an unlawful killing. We review for prejudicial error. *Commonwealth* v. *Vuthy Seng*, 456 Mass. 490, 502 (2010).

Where there is evidence of self-defense, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant did not act in self-defense. *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-688 (1976). We evaluate jury instructions "as a whole, looking for the interpretation a reasonable juror would place on the judge's words," *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998), quoting *Commonwealth* v. *Trapp*, 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996), rather than "scrutiniz[ing] bits and pieces removed from their context," *Commonwealth* v. *Niemic*, *supra*, quoting *Commonwealth* v. *Perez*, 390 Mass. 308, 313 (1983). Here, the judge's instructions as a whole properly placed the burden on the Commonwealth to prove an unlawful killing. The judge correctly explained, in defining the first element of murder in the first degree, an unlawful killing, that a killing in self-defense is not unlawful and that the "evidence in this case does raise the issue of whether the killing was excused as a result of the defendant's act of self-defense." See *Commonwealth* v. *Williams*, 450 Mass. 879, 883 (2008). In addition, in defining self-defense the judge instructed once before and twice after the challenged instruction that, at all times, the Commonwealth had the burden of disproving self-defense. Looking at the instruction as a whole, no

defense instruction relating to retaliation or revenge. This claim was not raised by the defendant and is belied by our reading of the jury instructions.

reasonable juror could have concluded that the Commonwealth was relieved of its burden of proving an unlawful killing.

We next take up the defendant's suggestion that the challenged instruction incorrectly conveyed that the right to self-defense would be lost to a person who provokes by speech as opposed to provoking by violence or by threats of violence. It is a settled rule of law that, "[i]n general, self-defense is unavailable to the person who initiates the fray," *Commonwealth* v. *Carrion*, 407 Mass. 263, 268 (1990), or "to a defendant who provokes or initiates an attack," *Commonwealth* v. *Rodriquez*, 461 Mass. 100, 110 (2011).[11] See *Commonwealth* v. *Espada*, 450 Mass. 687, 693 (2008); *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 733 (2007); *Commonwealth* v. *O'Neil*, 418 Mass. 760, 765 (1994); *Commonwealth* v. *Naylor*, 407 Mass. 333, 335 (1990); *Commonwealth* v. *Griffith*, 404 Mass. 256, 264-265 (1989). This is so because someone who provokes or initiates an attack cannot be said to be taking advantage of every opportunity to avoid the combat. See *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978).

Although the language in the challenged instruction appears in many of our decisions, it is potentially overbroad because it does not define what constitutes provocation of the type that results in the forfeiture of a self-defense claim. Of concern to the defendant is that the language does not differentiate between verbal and physical provocation. The lack of any distinction, however, is inconsequential in this case. The restaurant manager did not see what had caused the groan she heard, presumably from the victim. When the defendant entered the store, the manager did overhear him make an insulting remark to *Williams* about the victim ("Is this this nigger you was talking shit to me about?"), but not a statement or threat of violence *to the victim*, and the manager thereafter saw *both* men, not just the defendant, make "reaching gestures." Before the victim was stabbed, Lungelow overheard the defendant suggest that he and

---

[11]The rule of law permits an exception: "[T]he right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault *unless* that person withdraws in good faith from the conflict and announces his intention to retire" (emphasis added). *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978).

the victim fight, but then Lungelow saw the defendant "charge[]" the victim. Hazard characterized what she saw as the defendant physically attacking the victim. Last, under the accounts given by Williams and the defendant, after some mutual banter, it was the victim who, by throwing a punch at the defendant, was the first aggressor, and the defendant did not respond with deadly force until after the victim got, or attempted to get, physical. Thus, on no view of the evidence in this case could the defendant, if seen as the first aggressor, be said to have provoked or initiated the altercation by words alone to the victim. There was a physical element introduced by the defendant, or mutual threat of violence involved, before the victim allegedly exerted deadly force against him.

Consequently, based on the evidence of this case, no prejudice can be said to have arisen from the failure of the challenged instruction to differentiate between verbal and physical provocation in the context of who was the initial aggressor.[12]

5. *Review pursuant to G. L. c. 278, § 33E.* We have examined the record and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E, to set aside or reduce the verdict of murder in the first degree.

*Judgment affirmed.*

---

[12]In future cases, when a first aggressor or initial aggressor instruction is given in the context of self-defense we advise that the judge make clear that conduct involving only the use of nonthreatening words will not be sufficient to qualify a defendant as a first aggressor. So that no burden shifts to the defendant to prove justification of the exercise of force in self-defense, see *Commonwealth* v. *Harrington*, 379 Mass. 446, 454 (1980), the jury should also be instructed that the Commonwealth must prove beyond a reasonable doubt that defendant was the first aggressor.