**FIRE INSURANCE EXCHANGE,**
Farmers Insurance Exchange,
Plaintiffs,

v.

Alexander PRING–WILSON, Cindy
Guzman, as Executrix of the Estate of
Michael Colono, Defendants.

Civil Action No. 09–11420–PBS.

United States District Court,
D. Massachusetts.

March 9, 2011.

William A. Schneider, Steven M. Couch, Morrison Mahoney LLP, Boston, MA, for Plaintiffs.

Alexander Pring–Wilson, Colorado Springs, CO, pro se.

Elizabeth N. Mulvey, Michael J. Harris, Crowe & Mulvey, LLP, Boston, MA, for Defendants.

## ORDER

PATTI B. SARIS, District Judge.

ELECTRONIC ORDER ADOPTING [32] REPORT AND RECOMMENDA-TION on Motion for Summary Judgment filed by Farmers Insurance Exchange, Fire Insurance Exchange. ACTION ON MOTION.... "I adopt the Report & Rec-ommendation and DENY [22] Plaintiff's Motion for Summary Judgment".

### REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (# 22)

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

In 2003 Alexander Pring–Wilson ("Wilson") was involved in an altercation that led to the death of Michael Colono. In civil wrongful death proceedings brought by Colono's estate in the Massachusetts Superior Court, Wilson was found liable in negligence and a judgment of $260,000 was issued against him. *Guzman, as Executrix of the Estate of Colono v. Pring–Wilson,* Civil Docket No. MICV2006–00892 (Middlesex Sup.Ct. Mar. 1, 2010). Wilson is currently pursuing an appeal of this judgment through the state courts.

Wilson's mother, Cynthia Pring, is a named insured on a homeowner's policy issued by Fire Insurance Exchange ("Fire Insurance") and is the named insured on an umbrella policy issued by Farmers Insurance Exchange ("Farmers Insurance") (collectively, "the plaintiffs"). Fire Insurance provided and continues to provide Wilson with a defense to the claims asserted in the wrongful death proceedings in state court, subject to a complete reservation of rights.

On August 26, 2009, Fire Insurance and Farmers Insurance filed a complaint in federal court for declaratory relief seeking a judicial determination that they owe no duty to indemnify Wilson for the state court judgment levied against him. (# 1) On April 30, 2010, the plaintiffs moved for summary judgment. (# 22) Both Colono's estate and Wilson opposed the motion. (# 27, 28) The summary judgment motion was referred to the undersigned on May 27, 2010.(# 26) Oral argument on the motion was held on October 12, 2010. Plaintiffs were granted leave to file a short supplemental brief, which they did on December 2, 2010. (# 30, 31)

The summary judgment motion is now poised for resolution.

### II. FACTUAL BACKGROUND

#### A. The Insurance Policies

Cynthia Pring is a named insured on both a Homeowner's Insurance Policy issued by Fire Insurance with a policy period running from December 20, 2002 until May 1, 2003, and on an Umbrella Insurance Policy issued by Farmers Insurance with a policy period running from May 29, 2002 until May 1, 2003. (# 1 Ex. A at 1 and Ex. B at 2) The policies insure not only Pring but also her relatives who are residents of her household. (# 1 Ex. A at 3 and Ex. B at 7) For the purposes of resolving the summary judgment motion, this Court assumes without deciding that the two policies insure her son, defendant Wilson.[1]

Both policies state that if an insured is sued and held liable for damages, the insurer will pay the damages, provided that the damages were the result of—to use the insurance policies' term—an "occurrence." (# 1 Ex. A at 8 and Ex. B at 8) Both policies define the term "occurrence," in relevant part, as an "accident" that results in bodily injury or property damage during the policy period. (# 1 Ex. B at 7, # 24 Ex.

---

**1.** In their complaint, the plaintiffs allege that Wilson, at the time of his altercation with Colono, was not a resident of Pring's household and is not insured by the insurance policies. (# 1 at ¶ ¶ 21, 34–35, 51–53) Both Colono's estate and Wilson dispute this allegation.

(# 4 at ¶ ¶ 21, 34–35, 51–53; # 19 at ¶ ¶ 21, 34–35, 51–53) The Plaintiffs' memoranda in support of their summary judgment motion does not argue that Wilson is not insured by Pring's two policies.

D at 10)[2] Neither policy defines the term "accident."

Both policies contain exclusion clauses making clear that the policies do not cover damages caused intentionally. The Homeowner's Policy states that Fire Insurance does not cover personal liability payments to others for "bodily injury, property damage or personal injury which . . . is either a. caused intentionally by or at the direction of an insured; or b. results from any occurrence caused by an intentional act of any insured where the results are reasonably foreseeable." (# 24 Ex. D at 21) The Umbrella Policy states that Farmers Insurance "does not cover damages . . . [e]ither expected or intended from the standpoint of an insured." (# 1 Ex. B at 8) The Umbrella Policy exclusion clause includes a carve-out for self-defense, stating that the exclusion "does not apply to damages for bodily injury if such insured acted with reasonable force to protect persons or property." (# 1 Ex. B at 8)

### B. Wilson's altercation with Colono and subsequent legal proceedings

On April 12, 2003, Wilson was involved in a physical altercation with Colono and Colono's cousin Sammy Rodriguez. (# 1 at ¶ 15, # 27 at ¶ 15, # 28 at 4)[3] Colono died from a wound sustained during the altercation. (# 1 at ¶ 16, # 27 at ¶ 16, # 28 at 4–5). The details of this altercation will be discussed, infra, after a recitation of the legal proceedings that arose as a result of the altercation.

Following the events of April 12, 2003, the Commonwealth of Massachusetts charged Wilson with first degree murder. (# 1 at ¶ 23, # 19 at ¶ 23, # 27 at ¶ 23) On October 14, 2004, a jury convicted Wilson of the lesser included offense of voluntary manslaughter (# 24 Ex. G at 13), but after the Massachusetts Supreme Judicial Court set forth a new evidentiary rule in an unrelated case, the trial court judge in Wilson's case held that the "integrity of the evidence" against Wilson "has been rendered suspect as a result of the decision of the Supreme Judicial Court." See Commonwealth v. Pring–Wilson, 448 Mass. 718, 720, 863 N.E.2d 936, 939 (2007). The trial court vacated Wilson's conviction and ordered a new trial. Id. The Commonwealth appealed. Id.

On March 22, 2006, while the Commonwealth's appeal in Wilson's criminal case was pending, Cindy Guzman, as executrix of Colono's estate, commenced a civil wrongful death action against Wilson in state court. The case was stayed pending the outcome of Wilson's criminal trial. (# 24 Ex. C)

On April 10, 2007, the Supreme Judicial Court affirmed the vacation of Wilson's criminal conviction and ordered a new criminal trial. Commonwealth v. Pring–Wilson, 448 Mass. at 720, 863 N.E.2d 936. On December 14, 2007, Wilson's second criminal trial ended in a deadlocked jury, and the court declared a mistrial. (# 24 Ex. G at 22)

---

**2.** The copy of Pring's Homeowner's Policy provided by the Plaintiffs as Exhibit A of their complaint (# 1 Ex. A) includes only the odd-numbered pages of the policy. The Plaintiffs attached a full copy of the Homeowner's Policy to their Local Rule 56.1 Statement of Material Facts. (# 24 Ex. D.)

**3.** Wilson is proceeding pro se in this matter. In his answer to plaintiffs' complaint, Wilson formally denied plaintiffs' allegation that he

was involved in an altercation with Colono on April 12, 2003. (# 19 at ¶ 15) In his response to Plaintiffs' motion for summary judgment, however, Wilson describes the events of April 12, 2003, as a "fight" initiated by Colono and Rodriguez, and it is this Court's understanding that Wilson does not dispute that the fight took place, but that he does dispute, quite vigorously, what actually transpired during the course of the fight. (# 28 at 4–5)

Instead of proceeding with a third trial, on January 11, 2008, Wilson and the Commonwealth of Massachusetts entered into a plea agreement, and Wilson plead guilty to involuntary manslaughter. (# 1 at ¶ 25, # 19 at ¶ 25, # 27 at ¶ 25) As part of the plea agreement, the Commonwealth and Wilson jointly recommended a sentence of two years and one day, which was in fact the term to which Wilson was sentenced. (# 24 Ex. G at 22 and Ex. H at 9, 43–44) This concluded the criminal proceedings against Wilson.

The civil wrongful death proceedings brought by Colono's estate were tried to Associate Justice Thomas Billings of the Middlesex Superior Court, jury-waived, from February 10 until February 16, 2010. (# 24 Ex. B at 1) On March 1, 2010, Justice Billings issued his Findings of Fact, Conclusions of Law, and Order for Judgment. (# 24 Ex. B at 21) Justice Billings made extensive factual findings, discussed further below, and found Wilson liable in negligence and entered a judgment of $260,000 against him. (# 24 Ex. B at 21)

### C. Justice Billings' Findings of Fact

The following facts are taken from Justice Billings' extensive findings.

In April 2003, Wilson was in his second and final year of a Master's degree program at Harvard University. (# 24 Ex. B at¶ 1) On Friday, April 12, 2003, Wilson went drinking with friends in Cambridge and disbanded at about 1:30 in the morning. (# 24 Ex. B at ¶¶ 2–5, 7) Wilson began walking home alone, talking on his cell phone to his girlfriend (now wife) in Colorado as he walked along Western Avenue. (# 24 Ex. B at ¶¶ 7, 19) By that time, Wilson had consumed seven or eight drinks and was intoxicated to the point where his speech, motor coordination and judgment were perceptibly impaired. (# 24 Ex. Bat¶ 6)

At the same time, Colono, his cousin Sammy Rodriguez, and Rodriguez's girlfriend Giselle Abreu were sitting in a car parked near Pizza Ring, a restaurant at 414 Western Avenue, waiting for a pizza Rodriguez had ordered. (# 24 Ex. B at ¶¶ 13–15) Rodriguez and Colono had been drinking. (# 24 Ex. B at ¶¶ 11, 13, 16)

As he walked up Western Avenue, Wilson was visible through the windshield of the Colono vehicle. (# 24 Ex. B at ¶ 18) Colono, who was sitting in the driver's side rear seat of the car with the window open, said something along the lines of, "Look at that motherfucker, he's shitfaced." (# 24 Ex. B at ¶ 18) As Wilson passed the car, Colono told Wilson to "get off the street." (# 24 Ex. B at¶ 18)

Wilson heard someone address him from the car but did not hear what was said. (# 24 Ex. B at ¶ 19) Thinking that the occupants of the car might be asking him for directions, he ended his phone call with his girlfriend, walked back to the car, and asked, "Were you talking to me?" (# 24 Ex. B at ¶ 19) Colono replied, "Yeah, do you want to do something about it?," or words to similarly confrontational effect. (# 24 Ex. B at¶ 20)

Wilson said either "Fuck you" or "Fuck off," and turned to leave. (# 24 Ex. B at ¶ 21) Colono opened his door, exited the car, rushed at Wilson and attacked him. (# 24 Ex. B at ¶¶ 22, 24, 26) Although Colono started the fight, there is no evidence that Wilson made any meaningful effort to avoid it. (# 24 Ex. B at ¶ 24)

For a short time it was an even fight. (# 24 Ex. B at ¶ ¶ 26–27) Each man was punching the other. (# 24 Ex. B at ¶ 26) Colono stomped on Wilson's unprotected right foot at least twice. (# 24 Ex. B at ¶ 26) At this stage of the fight, neither man had suffered any significant injury, and it is likely neither of them would have

suffered any significant injury had the fight not escalated. (# 24 Ex. B at¶ 27)

Rodriguez joined the fight as quickly as he could. (# 24 Ex. B at ¶ 28) Rodriguez was initially sitting in the front passenger seat of the car; the inside door handle on the front passenger door was broken, and in order for Rodriguez to exit the car, Abreu (who was sitting in the driver's seat) had to turn the car key to the ignition position so that Rodriguez could lower his electrically-operated window, reach out, and open the door from the outside. (# 24 Ex. B at ¶ 28) Rodriguez's delay in joining the fight was due to the time it took him to exit the vehicle, not because he had been watching passively as the fight between Wilson and Colono unfolded. (# 24 Ex. B at ¶ 28) Rodriguez ran to the fight, grabbed Wilson from behind, and punched him a few times in the head. (# 24 Ex. B at ¶ 29) The blows were from close range and caused only minor injury. (# 24 Ex. B at ¶¶ 29, 29 n. 8)

Wilson had a large folding knife in his back right pocket, which he carried out of habit and typically used as a general utility tool. (# 24 Ex. B at ¶ 30) The knife had a plastic handle and a single, locking, partially serrated 4–inch blade with a finger-sized hole for one-handed operation. (# 24 Ex. B at ¶ 30) After Rodriguez joined the attack and started punching Wilson from behind, Wilson—who at this point had suffered no injury more serious than minor contusions (bruises) and abrasions (scrapes)—pulled his knife out with his right hand. (# 24 Ex. B at ¶¶ 31–32) Neither Colono nor Rodriguez used, displayed, possessed, or appeared to possess a weapon of any kind. (# 24 Ex. B at¶ 32)

Wilson opened the knife and began flailing at the person in front of him, Colono. (# 24 Ex. B at ¶ 31) Wilson's intent, in pulling out the knife and using it as he did, was not to kill or even to inflict serious

injury on either of his assailants; it was to drive them away. (# 24 Ex. B at¶ 37)

Rodriguez, standing behind Wilson, grabbed him by the shoulders of his jacket and threw him to the ground, where Wilson landed on his hands and knees. (# 24 Ex. B at ¶ 33) At that point, Rodriguez did not see that Wilson had a weapon. (# 24 Ex. B at¶ 33)

Colono said, in Spanish, "Be careful-he has a knife." (# 24 Ex. B at ¶ 31) Rodriguez then saw the knife for the first time. (# 24 Ex. B at ¶ 33) Rodriguez did not realize that the knife had been used, and assumed that Wilson was showing the knife as a warning. (# 24 Ex. B at ¶ 33) Colono said, "Let's go." (# 24 Ex. B at ¶ 34) He and Rodriguez got back in the car, ending the confrontation, and Abreu drove them away. (# 24 Ex. B at¶ 34)

Wilson, evidently aware that he had made contact with his knife, called 911 and reported having seen a young man get stabbed, but denied any involvement. (# 24 Ex. B at ¶¶ 41–42) The time of the 911 call was 1:51:10 a. m. (# 24 Ex. B at ¶ 41) Wilson had terminated his phone call with his girlfriend at 1:50:00 a.m. (# 24 Ex. B at ¶ 41) The entire confrontation had begun and ended in the intervening 70 seconds. (# 24 Ex. B at ¶ 41) The fight itself lasted only 60 seconds. (# 24 Ex. B at¶ 28)

Colono was not initially in much pain; when he, Rodriguez and Abreu were driving away from the fight, none of them knew that Colono had been injured. (# 24 Ex. B at ¶ 35) In fact, Colono had received five knife wounds: 1) a 1/4–inch–deep incised wound (a slice wound rather than a stab wound), which was located one inch below his bellybutton and was too shallow to enter his peritoneal cavity, 2) a 1/2–inch–deep incised wound near his left wrist, 3) a 3/4–inch–deep stab wound, which was located about four inches to the

left of his bellybutton and was too shallow to enter his peritoneal cavity, 4) a 3/4–inch-deep stab wound, which was located below his left nipple and stopped at his sixth costal cartilage (connecting rib to sternum) without entering his chest cavity, and 5) a stab wound of unmeasured depth, which was also located below his left nipple and which passed through the fifth costal cartilage and penetrated the left ventricle of Colono's heart. (# 24 Ex. B at ¶ 35) The order in which the wounds were inflicted is unknown. (# 24 Ex. B at¶ 36 n. 10)

As the car headed away from the scene of the fight, Rodriguez began to converse with Colono and noticed that Colono was not responding as he should. (# 24 Ex. B at ¶ 45) Rodriguez remembered seeing a knife during the fight and asked Colono if he had been stabbed. (# 24 Ex. B at ¶ 45) Colono replied that he didn't know. (# 24 Ex. B at ¶ 45) Rodriguez tried to inspect Colono to see for himself if Colono had been stabbed, but his inspection was impeded by Colono's clothing. (# 24 Ex. B at ¶ 45) Rodriguez told Abreu to pull over, which she did. (# 24 Ex. B at ¶ 45) Rodriguez got out of the car, went to Colono's door, opened it, lifted Colono's shirt, and saw a hole in Colono's abdomen. (# 24 Ex. B at ¶ 45) Rodriguez also noticed that Colono was becoming less and less responsive. (# 24 Ex. B at¶ 45)

Neither Rodriguez, Abreu or Colono had a working cell phone. (# 24 Ex. B. at ¶ 46) Abreu and Rodriguez tried and failed to flag down a car to ask for help. (# 24 Ex. B at ¶ 46) They then drove to a 7–Eleven in Boston to call for help from a pay phone. (# 24 Ex. B at ¶ 46)

A passing Brookline Police squad car saw a crowd gathering outside the 7–Eleven and stopped. (# 24 Ex. B at ¶ 46) The officers found Colono lying on his back on the sidewalk, apparently conscious but unresponsive, with Rodriguez standing over him yelling, and Abreu, nearby, hysterical. (# 24 Ex. B at ¶ 47) Colono was transported by ambulance to Beth Israel–Deaconess Medical Center, where, at 3:35 a.m., he was pronounced dead. (# 24 Ex. B at ¶ 48, 50)

The stab wound that penetrated Colono's heart was fatal. (# 24 Ex. B at ¶ 36) Colono would have survived any or all of the other four knife wounds. (# 24 Ex. B at¶ 36)

### D. Justice Billings' Conclusions of Law

Two of Justice Billings' conclusions of law merit a brief recitation here, with the caveat that Justice Billings reached these conclusions in the context of a tort liability determination, not in the insurance contract interpretation context in which the instant motion arises.

First, Justice Billings noted that Wilson did not seek help from whoever was in the Pizza Ring restaurant, only two car-lengths away from the scene of the fight, and thus concluded that Wilson failed to avail himself of reasonable alternatives to combat. (# 24 Ex. B at ¶¶ 25, 37)[4]

Second, Justice Billings noted the number of knife wounds inflicted, and particu-

---

4. Although Justice Billings' observations on this point are located in the section of his opinion titled "Findings of Fact," not the section titled "Conclusions of Law," it is clear that they are legal conclusions or at most mixed determinations of law and fact, and are not pure factual findings. *See, e.g.,* # 24 Ex. B at¶ 38 ("[T]he law assigns the wielder of deadly force both a substantive duty of acting reasonably to preserve human life and, procedurally, the burden of proving that he fulfilled this duty. This, Wilson has failed to do."). Additionally, the legal observations in the "Findings of Fact" section are reproduced nearly verbatim in the "Conclusions of Law" section. (# 24 Ex. B at 21)

larly the nature of the fatal wound, and concluded that these were disproportionate to the danger actually posed or reasonably apprehended by Colono and Rodriguez's attack. (# 24 Ex. B at ¶ 37) He thus concluded that Wilson employed more force than was reasonably necessary to repel the attack. (# 24 Ex. B)

### E. Wilson's assertions disputing Justice Billings' findings and conclusions

In his filings before this Court, Wilson disputes some of the facts found and legal conclusions reached by Justice Billings. First, Wilson asserts that of the five knife wounds Colono sustained, he inflicted only the three stab wounds, not the two incise wounds; instead, he asserts, the incise wounds were the result of medical procedures. (# 28 at 2) Second, Wilson disputes Justice Billings' conclusion that Wilson used more force than was reasonably necessary. Third, Wilson disputes Justice Billings' conclusion that retreating from the fight to the Pizza Ring restaurant was a reasonable alternative to combat, asserting that he did not learn of Pizza Ring's existence until days after the fight. (# 28 at 10) [5]

### F. Other facts raised by Colono's estate

In its Opposition to Plaintiff's Summary Judgment Motion, Colono's estate points to Wilson's deposition testimony, taken in the course of the civil proceedings before Judge Billings, to draw attention to two assertions made by Wilson that are more detailed than and not inconsistent with Justice Billings' findings.

First, in his deposition, Wilson specifically stated that when he flailed with his knife, he did not intend to make contact with his assailant. (# 27 at ¶ 9; # 27 Ex. 4 at 8)

Second, Wilson suggested that when he pled guilty to involuntary manslaughter, his plea was motivated more by personal and financial reasons and was not entirely heartfelt, although Wilson stopped short of refuting anything he said under oath in his plea colloquy. (# 27 at ¶ 14; see also # 27, Ex. 5 (transcript of plea colloquy))

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[6] The Court "view[s] the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1 Cir. 1995). If, viewed in that light, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," then summary judgment shall

---

5. Wilson also raises other, minor disputes, such as: whether it was Rodriguez, not Colono, who spoke to Wilson through the car window and initiated the fight (# 28 at 10); whether Wilson and Colono exchanged punches when the fight began or whether only Colono was punching (# 28 at 10); and whether Wilson suffered only bruises and scrapes from the fight or whether he also was concussed, lost consciousness, and injured his knee and jaw (# 28 at 11).

6. Rule 56 was amended effective December 1, 2010. The summary judgment standard is now set forth in Rule 56(a), but "[t]he standard for granting summary judgment remains unchanged." Ophthalmic Surgeons, Ltd. v. Paychex, Inc., 632 F.3d 31, 35 n. 4 (1 Cir. 2011).

not issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

### A. Issues regarding choice of law, preclusion, and the facts before this Court

#### 1. Choice of law

█ Choice of law determinations must be made regarding three distinct issues in this case: 1) interpretation of the terms in Pring's two insurance contracts, 2) the preclusive effect of Justice Billings' findings of fact and conclusions of law in the civil wrongful death action brought against Wilson, and 3) the evidentiary effect of Wilson's guilty plea in the criminal proceedings brought against him. Because this Court sits in Massachusetts, Massachusetts' choice-of-law provisions apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Massachusetts Supreme Judicial Court has decided "not to tie Massachusetts conflicts law to any specific choice-of-law doctrine, but seek[s] instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole," and looks to the Restatement (Second) of Conflict of Laws (1971) as an "obvious source of guidance." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631–32, 473 N.E.2d 662, 668–69 (1985).

As to contract interpretation, § 188(1) of the Restatement[7] states that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant rela-

tionship to the transaction and the parties." Following that guidance, the Supreme Judicial Court has held specifically that whether an insurer has a duty to indemnify a claim under an insurance policy "should not depend on the law of the jurisdiction governing that particular claim but rather should be determined by the law governing the interpretation of the insurance policy and its issuance." *W.R. Grace & Co. v. Hartford Accident and Indem. Co.*, 407 Mass. 572, 586, 555 N.E.2d 214, 221 (1990).

█ Here, the insurance policies at issue are closely tied to Colorado and have little or no relationship to Massachusetts. They were negotiated and issued in Colorado, they identify Colorado residents as named insureds, and they cover, among other things, property located in Colorado. Accordingly, pursuant to Massachusetts choice-of-law rules, the insurance policies at issue in this case will be interpreted consistent with the substantive law of Colorado.

█ As to any preclusion issues, § 95 of the Restatement states that "[w]hat issues are determined by a valid judgment is determined, subject to constitutional limitations, by the local law of the State where the judgment was rendered." The civil and criminal judgments against Wilson were both rendered in Massachusetts. Accordingly, preclusion questions in this case will be governed by Massachusetts law.

█ As to evidentiary issues, § 138 of the Restatement states that "[t]he local law of the forum determines the admissibility of evidence." Accordingly, evidentia-

---

**7.** All citations to the Restatement are to the Restatement (Second) of Conflicts of Law (1971).

ry issues in this case will be resolved consistent with Massachusetts law.

### 2. The preclusive effects of Judge Billings' findings and conclusions

■ Wilson's *pro se* filing on this motion disputes some of the factual findings made by Justice Billings in Guzman, as Executrix of the *Estate of Colono v. PringWilson*, Civil Docket No. MICV2006–00892 (Middlesex Sup.Ct. Mar. 1, 2010). (# 28 at 2–5, 10–11). However, a party in Wilson's position is precluded from disputing findings made from a prior adjudication if 1) there was a final judgment on the merits in the prior adjudication, 2) the party was also a party in the prior adjudication, 3) the issue being precluded in the current case is identical to the issue in the prior proceeding, and 4) the issue decided in the prior proceeding was essential to the final judgment in that adjudication. *Tuper v. North Adams Ambulance Serv., Inc.*, 428 Mass. 132, 134–35, 697 N.E.2d 983, 985 (1998).

■ As to Justice Billings' factual findings, all four factors are present here. Under Massachusetts law, "a trial court judgment is final and has preclusive effect regardless of the fact that is it on appeal," so Justice Billings' judgment in the case of *Estate of Colono v. Pring–Wilson* is final despite the fact that Wilson is currently appealing that judgment. *O'Brien v. Hanover Ins. Co.*, 427 Mass. 194, 201, 692 N.E.2d 39, 44 (1998).[8] Wilson was a party in *Estate of Colono*. The facts Wilson disputes in the instant case are precisely those he litigated in *Estate of Colono*. Finally, many of the facts Wilson now dis-

putes were central to Justice Billings' judgment. Under Massachusetts law regarding preclusion, Wilson may not dispute these facts as found by Justice Billings.

■ Not so Justice Billings' legal conclusions. The wrongful death action before Justice Billings was a tort case. The instant action is a declaratory action regarding an insurance contract governed by the substantive contract law of Colorado. Colorado has expressly rejected the idea that the legal standards applied in tort cases can be imported into the insurance contract context. *Am. Fam. Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 956 (Colo.1991) Because the Colorado-law-governed contract interpretation issue in the current proceeding is not identical to the tort law questions resolved by Justice Billings in Massachusetts state court, it would be inappropriate to give his conclusions of law preclusive effect.

### 3. The preclusive and evidentiary effects of Wilson's guilty plea

■■ Colono's estate argues that Wilson's guilty plea has no preclusive effect, and that Wilson is permitted to explain his plea and his reasons for entering it. (# 27 at 18) The Court agrees on both counts. First, "the doctrine of collateral estoppel does not apply to preclude the former criminal defendant from litigating in subsequent civil litigation issues involved in the criminal proceeding in which he pleaded guilty." *Aetna Cas. & Sur. Co. v. Niziolek*, 395 Mass. 737, 748, 481 N.E.2d 1356, 1363 (1985). Second, "[t]he plea maybe explained and reasons shown for

---

8. The Court appreciates plaintiffs' supplemental brief on this point, and acknowledges their assertion that Wilson's pending state civil court appeal did not challenge any of Justice Billings' findings of fact. *See* # 31 Ex. A at 1

(only issue presented for review is "Whether It Was Error, Based On The Findings Of Fact, For The Trial Court To Conclude That [Wilson] Acted Negligently.")

entering it." *Id.* at 747, 481 N.E.2d at 1363.

### B. Could a jury find that Colono's death was an "occurrence," as that term is used in the insurance policies?

The two insurance policies in question cover damages that arise as a result of an "occurrence." (# 1 Ex. A at 8 and Ex. B at 8) Both policies define an "occurrence" as, inter alia, "an accident." (# 1 Ex. B at 7, # 24 Ex. D at 10) Neither policy defines the term "accident." (# 1 Ex. B at 7, # 24 Ex. D at 9–10) The Court is mindful that, under Colorado law, "coverage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage." *Fire Ins. Exch. v. Bentley,* 953 P.2d 1297, 1300 (Colo.App.1998) (citing *Tepe v. Rocky Mountain Hospital & Medical Servs.,* 893 P.2d 1323 (Colo.App.1994)). If, as a matter of Colorado insurance law, the incident between Wilson and Colono was not an accident, then the insurance policies do not cover the damages levied against Wilson and summary judgment should issue. If, on the other hand, a jury could find that the incident was an accident, as that term is understood by Colorado law, then summary judgment is inappropriate.

Colorado law defines "accident" in the insurance context as follows: "[A]s long as the resulting injury or death is unexpected, unintended, and unforeseeable then the injury or death is accidental.... [A] voluntary act that causes an unforeseeable, unintended, or unexpected result can be considered an accident." *Carroll v. CUNA Mut. Ins. Soc.,* 894 P.2d 746, 752–53 (Colo. 1995). *See also Bentley,* 953 P.2d at 1301 (citing Carroll for the proposition that the term accident "has been defined as an unanticipated or unusual result flowing from a commonplace cause.").[9]

Plaintiffs offer one case to illustrate non-accidental conduct under Colorado insurance law. In *Am. Family Mut. Ins. Co. v. Terlingen,* No. 08–cv–01273, 2008 WL 5156425 (D.Colo. Dec. 9, 2008), defendant Terlingen took a golf club from the trunk of his car, followed two people into the parking lot of a McDonald's restaurant, used the golf club to beat them with such force that the head of the club eventually broke off, and then took the shaft of the broken club and stabbed one of the two victims in the chest. *Terlingen,* 2008 WL 5156425 at *1. One victim sustained a broken arm and the other sustained a sprained wrist, a dislocated thumb, and stab wounds to the chest. *Id.* The two victims brought a civil action against Terlingen in Colorado state court. *Id.* As in

---

9. Colono's estate asserts that "accident" is a vague term that must be interpreted from the viewpoint of the insured, # 27 at 8–9 (citing *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan,* 605 F.3d 789 (10 Cir.2010) and *Wickman v. Northwestern Nat. Ins. Co.,* 908 F.2d 1077, 1087 (1 Cir.1990)), and that a volitional act that causes harm is still an accident if the insured does not specifically intend to cause the resulting harm, # 27 at 9–10 (citing *City of Newton v. Krasnigor,* 404 Mass. 682, 686, 536 N.E.2d 1078 (1989)).

The authority offered by Colono's estate in support of this assertion, while helpful for developing a general understanding of the

legal complexity of the term "accident," is of little assistance in this Court's efforts to determine the meaning of the term "accident" under Colorado law. *LaAsmar* and *Wickman* interpret the term in the context of federal ERISA law, which preempts state law regarding contract interpretation.

*Wickman,* 908 F.2d at 1081–82 ("The threshold question in this case is whether plaintiff's claim is properly a claim under ERISA, or, in the alternative, a claim under state law."); *LaAsmar,* 605 F.3d at 794. In *City of Newton,* the Massachusetts Supreme Judicial Court provided a clear encapsulation of the definition of "accident" under Massachusetts law, but cast no light on Colorado law.

the instant case, Terlingen held an insurance policy that covered damages arising out of "an occurrence," defined as "an accident," and excluded coverage for damages arising out of an intentional act. *Id.* The insurer sought a declaratory judgment stating that there was no occurrence and that the injuries were intentional and thus excluded. *Id.* at *2. The court stated that "[t]here was nothing unanticipated or unusual about the result of Terlingen's attack," and that "[i]t is completely within the realm of foreseeable consequence that [the victims] should have sustained injuries of the type and degree alleged as a result of being struck repeatedly with a golf club;" the court held that the event was not an accident and thus not an occurrence, and granted the plaintiff's motion for summary judgment without reaching the issue of the exclusion for intentional acts. *Id.* Terlingen did not contest the declaratory action, and pled guilty to felony assault in a separate criminal proceeding. *Id.* at *1 n. 2 and n. 3.

■ The facts surrounding Wilson's case are distinguishable from Terlingen's. Terlingen pursued and attacked his victims while Wilson was attacked. Unlike Terlingen, Wilson denies any intent to cause harm, asserting that when he flailed with his knife, he was trying "to get [one of his two attackers] away from in front of me," and did not intend to actually make contact with the attacker with his knife, # 27 Ex. 4 at 6, 8, an assertion which is not inconsistent with Justice Billings' finding that Wilson's intent was not to kill or inflict serious injury but to drive his attackers away. (# 24 Ex. B at ¶ 37) It seems entirely possible that Terlingen inflicted exactly the level and amount of injury he intended; Justice Billings has already conclusively found that Wilson did not intend the result of his actions. (# 24 Ex. B at ¶ 37) The fact that Terlingen's conduct was not acciden-

tal, and thus not an occurrence, does not persuade this Court that Wilson's conduct must be categorized the same way.

Other facts in this case buttress the possibility that Colono's death was accidental. The fight was extremely quick and confused; mere seconds elapsed between Wilson removing the knife from his back pocket and Colono and Rodriguez retreating. (# 24 Ex. B at ¶¶ 28, 31). At the conclusion of the fight Colono was not aware that he had been wounded and Rodriguez was not aware that a knife had even been used. (# 24 Ex. B at ¶¶ 33, 35) At least four of the five knife wounds Colono sustained, and possibly all five, were very shallow (3/4' deep or shallower). (# 24 Ex. B at ¶ 35)

For all these reasons, and viewing the facts of this case in the light most favorable to Wilson, the Court holds that a jury could find that Wilson did not intend, expect or foresee Colono's death, that Colono's death was therefore an accident and thus an "occurrence" within the terms of the insurance policies.

*C. Could a jury find that the intentional act exclusion in the Homeowner's Policy does not apply?*

■ The Homeowner's Policy states that Plaintiff Fire Insurance does not cover damages that are either A) "caused intentionally by or at the discretion of an insured; or" B) "result[ ] from any occurrence caused by an intentional act of any insured where the results are reasonably foreseeable." (# 24 Ex. D at 21) Exclusion clauses are interpreted narrowly under Colorado law; "[t] o benefit from an exclusionary provision in a particular contract of insurance the insurer must establish that the exemption claimed applies in the particular case and that the exclusions are not subject to any other reasonable interpretations." *Am. Family Mut. Ins. Co. v.*

*Johnson,* 816 P.2d 952, 953 (Colo.1991). The Court will examine in turn each subclause of the exclusionary clause.

Plaintiffs cite a series of cases in support of their assertion that the damages associated with Colono's death are excluded under subclause A. The Court finds these cases inapposite and plaintiffs' argument unavailing. Plaintiffs offer two cases where, unlike here, the insured was precluded from arguing that the damages at issue were not the result of an intentional act. *Butler v. Behaeghe,* 37 Colo.App. 282, 548 P.2d 934, 938 (1976); *Poole v. State Farm Fire & Cas. Co.,* 941 F.Supp. 964, 967 (D.Colo.1996), *aff'd,* 125 F.3d 862 (10 Cir.1997) (Table). Wilson is not precluded from arguing that he did not intend to injure Colono.

The Court also finds unavailing the plaintiffs' reliance on *WestAm. Ins. Co. v. Maestas,* 631 F.Supp. 1565 (D.Colo.1986), *Lopez v. Am. Family Mut. Ins. Co.,* 148 P.3d 438 (Colo.App.2006), and *Am. Family Mut. Ins. Co. v. Johnson,* 816 P.2d 952 (Colo.1991), three cases where intent was either conceded or not contested by the insured. In *Maestas,* the insurer successfully argued that damages flowing from the insured's conduct—during a protracted fight that began in a bar and ended in a neighboring parking lot, the insured bit off his victim's nose and ears—were intentional and thus excluded under the terms of the insurance policy at issue. *Maestas,* 631 F.Supp. at 1565–66. But the insured in that case did not contest that he intended to harm his victim; that alone is sufficient to distinguish between *Maestas* and the instant case. Further, even if the insured in *Maestas* had contested the issue of intent, the Court likely would not find that case instructive. The quick, confused struggle between Wilson, Colono and Rodriguez bears little resemblance to the long-er and much more vicious affair in *Maestas.*

In *Lopez,* the insurer successfully argued that an intentional acts exclusion clause applied to injuries inflicted when the insured retrieved a BB gun from his brother's room and shot his victim five times in the head and back. *Lopez,* 148 P.3d at 438. The insured in *Lopez* did not contest the civil action brought against him by his victim, nor did he contest the subsequent declaratory action brought by the insurer, but in the latter action the victim did argue that it was at least unclear whether the insured's actions were intended to cause injury or were merely negligent. *Id.* at 438–39. The Colorado Court of Appeals relied on Colorado criminal law for the principle that "intent to injure can be inferred from the repetition of an act that a person knows will cause injury or harm," and held that, since the insured "would have [had] to aim at the same target and pull the trigger five separate times in order to hit the victim with five pellets," it was appropriate to infer that the insured intended to harm his victim. *Id.* at 439–40. The instant case differs from Lopez in two key ways. First, it is not clear that waving his knife was an act that Wilson knew would cause injury or harm; he can and does assert that he did not intend to bring his knife into contact with his attacker. Second, while *Lopez* involved the repetition of an act—five instances of aiming and shooting-viewed in the light most favorable to Wilson, the instant case involves only one brief, frantic effort to clear away an assailant. The fact that that one effort led to five wounds is not necessarily important; it is unclear whether the same movement could have caused more than one of Colono's wounds (for example, one thrust leading to both an incise wound and a stab wound) it is unclear how many, if any, of Colono's wounds were the result of Wilson's thrusts as op-

posed to Colono lurching at Wilson. The Court can see how a jury apprised of the notion that five separate gunshots creates an inference of intent could nonetheless find that Wilson did not intend to injure his attacker.

In *Johnson*, there was no dispute that the insured intended the injuries he caused. *Johnson*, 816 P.2d at 955. The insured in *Johnson* and his wife went to a bar; when the insured saw a woman he assumed to be his wife leave the bar with another man, he followed her to the parking lot and kicked her from behind. *Id.* at 952–53. When she turned around, the insured realized the woman was in fact not his wife, but a different patron at the bar. *Id.* The Colorado Supreme Court's holding in *Johnson* that an exclusionary clause applies where "the injuries that occurred were intended" even though "the actual victim of the injuries was not the person [the insured] intended to harm," *id.* at 957, does not apply here, where Wilson can and does assert that no injuries were intended.

On a slightly different tack, the plaintiffs point to two additional cases where Colorado courts have determined that a certain type of conduct includes a *per se* intent to harm, even if the insured asserts that he had no intent to cause harm as a result of his admittedly voluntary action. *Allstate Ins. Co. v. Troelstrup*, 789 P.2d 415, 419 (Colo.1990); *Colo. Farm Bureau Mut. Ins. Co. v. Snowbarger*, 934 P.2d 909, 911 (Colo. App.1997) (applying *Troelstrup* rule). But the *Troelstrup* rule was designed to apply only in the "limited circumstances" of child molestation cases, *Troelstrup*, 789 P.2d at 419 (quoting *Rodriguez v. Williams*, 107 Wash.2d 381, 729 P.2d 627, 630 (1986)), and those circumstances are quite far afield from the instant case.

■ All in all, it is this Court's conclusion that, for essentially the same reasons that under Colorado law a jury could find

that Colono's death was an accident and an "occurrence" within the terms of the insurance policies, under Colorado law a jury could also find Colono's injuries were not "caused intentionally by or at the discretion of" Wilson, and thus could find that subclause A of the Homeowner's Policy intentional act exclusion clause does not apply to those injuries.

Compared to the amount of caselaw regarding the phraseology in subclause A, Colorado courts offer comparatively little guidance regarding the proper interpretation of the terms used in subclause B. The Court has identified only two cases that shed light on the concept of "reasonable foreseeability" in the context of insurance contracts.

The first is *Fire Ins. Exch. v. Bentley*, 953 P.2d 1297 (Colo.App.1998), which is, to this Court's knowledge, the only Colorado case that interprets reasonable foreseeability in an insurance context. In *Bentley*, an insured had a sexual encounter, allegedly tape-recorded the encounter without his partner's consent, and allegedly played the tape recording to undisclosed third parties. *Bentley*, 953 P.2d at 1299. The insured pled no contest to a criminal count of unlawful interception of communications. *Id.* His sexual partner then sued him for negligent invasion of privacy, intentional invasion of privacy, unlawful interception of oral communications, and three claims for conspiracy (against the insured and the insured's father). *Id.* The insured was covered by an insurance policy that included an intentional acts exclusionary clause that is identical to the clause in the Homeowner's policy in the instant case. *Id.* at 1300. In a parallel declaratory action brought by the insurer, the insured argued that, while he did not contest that he intentionally played the tape for third persons to hear, there was no evidence he intended to injure his sexual partner by

playing the tape. *Id.* at 1301. In the declaratory action, the Colorado Court of Appeals found for the insurer, holding that because the insured's conduct was intentional and "the result was not necessarily unanticipated or unusual[,] ... injury from [the insured's] conduct was reasonably foreseeable as a matter of law" and subclause B of the exclusionary clause applied. *Bentley,* 953 P.2d at 1301.

On one hand, the language used by the *Bentley* court does provide some support for the position taken in this case by plaintiffs. After all, Wilson admits that he intentionally waved his knife in close proximity to an attacker, and in that context it is "not necessarily ... unusual" that the result would be the infliction of a lethal knife wound upon the attacker. *Bentley,* 953 P.2d at 1301. On the other hand, the facts of the *Bentley* case are quite different from the facts of the instant case, and given those differences *Bentley*'s logic is not easily applicable to this case. In *Bentley,* there was no question that events unfolded precisely as the insured intended—he audiotaped his sexual encounter, as planned, and he played that audiotape for others, as planned. There was no dispute as to whether the insured in *Bentley* merely meant to place his hand near the tape-recorder, but never meant to hit "record" (or, later, in the company of third parties, "play"). *Bentley* would be an appropriate analogue here if Wilson argued that he did plan to stab Colono but did not intend for the resulting stab wound to injure him. But Wilson specifically argues that he did not intend to contact Colono with his knife, and it is not clear to this Court that, under *Bentley* at least, Colono's death was reasonably foreseeable (as that term is used in an insurance context) given Wilson's conduct.

The conclusion that Colono's death may not have been reasonably foreseeable un-der Colorado insurance law is reinforced by prescient *dicta* included by the Colorado Supreme Court in its *Johnson* opinion. The exclusionary clause at issue in *Johnson* excluded injuries "expected or intended by any insured," *Johnson,* 816 P.2d at 954; the clause did not include "reasonable foreseeability" language similar to the language in subclause B in this case. But the court nonetheless offered some guidance for interpreting such language:

> The exclusionary clause [in *Johnson*] exempts from coverage "injuries" intentionally caused by the insured. Thus our analysis must focus on whether Johnson intended to cause injuries-not whether he intended to engage in particular conduct that in fact resulted in injuries. While a particular insurance contract might contain language addressing this latter circumstance, such a contract would in all probability not serve the interests of the insured, as the following observations by one noted commentator indicate:
>
> > "All liability insurance policies have an exclusion for 'intentional damages' caused by or at the direction of the insured. However, the payment of premiums for liability insurance policies becomes pointless if all damages that result from an intentional act are excluded from coverage. Most individuals can protect themselves from causing intentional harm. It is the unexpected result that is cause for concern and the reason for seeking protection through liability insurance."

*Johnson,* 816 P.2d at 955 (quoting JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE, § 4492.01 at 21 (1979)).

The Court interprets this *dicta* as guidance suggesting that reading "reasonable foreseeability" clauses in insurance con-

tracts too broadly would be contrary to Colorado public policy.[10] Further, under Colorado insurance law, the question of whether an exclusionary clause that includes language exempting from coverage injuries "expected or intended" by an insured applies turns on "whether [an insured] intended to cause injuries-not whether he intended to engage in particular conduct that in fact resulted in injuries." *Johnson,* 816 P.2d at 955. The Court notes that this reading of the phrase "expected or insured" essentially removes the word "expected," despite the use of the disjunctive "or" in the clause: if an insured intended injuries, the injuries are "expected or intended"; if an insured did not intend injuries, as a matter of Colorado law the injuries are not "expected or intended," whether or not the injuries were in fact expected by the insured.

All this suggests to the Court that under Colorado insurance law, the concept of injuries that are "reasonably foreseeable," like the concept of injuries that are "expected" by the insured, should be construed quite narrowly.[11] The Court thus holds that if a jury chose to credit Wilson's claim that he did not intend to contact Colono with his knife, the jury could find that Colono's death was not a reasonably foreseeable result of Wilson's intentional act, and thus could find that subclause B of the Homeowner's Policy intentional act ex-

clusion clause does not apply to damages arising from Colono's injuries.

### D. Could a jury find that the intentional act exclusion the Umbrella Policy does not apply?

The Umbrella Policy states that Farmers Insurance "does not cover damages ... [e]ither expected or intended from the standpoint of an insured." (# 1 Ex. B at 8) Again, under Colorado insurance law, an exclusionary clause relying on the phrase "expected or intended" functions identically to an intentional act exclusion predicated solely on intent, such as the language in subclause A of the Homeowner's Policy at issue in this case. Therefore, for the same reasons that a jury could find that subclause A of the Homeowner's Policy does not apply, the Court also holds that a jury could find the intentional act exclusion of the Umbrella Policy does not apply.

### E. Could a jury find that the self-defense carve-out in the Umbrella Policy does apply?

 Even if a jury were to find that the Umbrella Policy's intentional act exclusion does apply to Colono's injuries, the Umbrella Policy exclusion clause includes a carve-out for self-defense, stating that the exclusion "does not apply to damages for bodily injury if such insured acted with

---

10. Suffice to say, the Court is not persuaded by plaintiffs' argument, set forth at pages 18–20 of their opening brief, that public policy interests tilt in plaintiffs' favor. The Court agrees that *Johnson* is the proper touchstone for public policy analysis here, *see* # 23 at 18 (beginning public policy argument by quoting *Johnson,* 816 P.2d at 957), but disagrees with plaintiffs as to the substance of *Johnson's* guidance.

11. Ever since the days of *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), the concept of "reasonable foreseeability" has held a central place in tort law,

where foreseeability is typically construed much more broadly than the Court construes it here. Indeed, the plaintiffs invoke a Massachusetts tort case to argue that because Justice Billings found Wilson negligent, Colono's injuries were necessarily within the reasonably foreseeable risk of harm created by Wilson's conduct. (# 23 at 13) (citing *Fund v. Hotel Lenox of Boston, Inc.,* 418 Mass. 191, 635 N.E.2d 1189 (1994)). But as discussed in section IV.A.2 *supra,* Colorado law keeps tort law analysis separate and distinct from cases interpreting insurance contracts. *Johnson,* 816 P.2d at 956.

reasonable force to protect persons or property." (# 1 Ex. B at 8) Wilson is not foreclosed from arguing to (and possibly convincing) a jury that this carve-out applies here. As already discussed, the fact that Justice Billings concluded that Wilson's conduct exceeded the bounds of self-defense as understood in Massachusetts tort law does not preclude Wilson from arguing that he was acting in self-defense as understood in Colorado insurance law. Additionally, he is entitled to attempt to explain that criminal plea to a civil jury, and it is not for this Court to prejudge whether such an attempt will be successful.

## V. CONCLUSION

For all of these reasons, the Court RECOMMENDS that Plaintiffs' Motion for Summary Judgment (# 22) be DENIED.

## VI. REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed.R.Civ.P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1 Cir.1988); *United States v. Emiliano Valencia–Copete,* 792 F.2d 4 (1 Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir.1982); *Park Mo-tor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).